1  **GREENBERG TRAURIG, LLP**
   Attorneys At Law
2  Suite 700
   2375 East Camelback Road
3  Phoenix, Arizona 85016
   Ph: (602) 263-2300
4  Fax: (602) 263-2350
   John R. Clemency (email: clemencyj@gtlaw.com) – SBN 009646
5  Todd A. Burgess (email: burgesst@gtlaw.com) - SBN 019013

6  **GREENBERG TRAURIG, P.A.**
   Attorneys at Law
7  1221 Brickell Avenue
   Miami, Florida 33131
8  Ph: (305) 579-0500
   Fax: (305) 579-0717
9  James P.S. Leshaw (email: leshawj@gtlaw.com) – FL Bar No. 917745
   Daniel Gold (email: goldd@gtlaw.com) – FL Bar No. 0761281
10
   Attorneys for Debtor First Magnus Financial Corporation
11

12              **IN THE UNITED STATES BANKRUPTCY COURT**

13                  **FOR THE DISTRICT OF ARIZONA**

14  | In re:                        | Chapter 11                 |
15  | FIRST MAGNUS FINANCIAL        | Case No. 4:07-bk-01578     |
16  | CORPORATION,                  |                            |
17  |                     Debtor.   |                            |
18

19      **DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF LIQUIDATION**
20          **FILED BY FIRST MAGNUS FINANCIAL CORPORATION DATED**
                       **OCTOBER 15, 2007**
21
                   Date: October 15, 2007
22

23

24

25

26

*PHX 327956879v8 10/15/2007*

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA   85016
(602) 445-8000

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...........................................................................................................1

II. OVERVIEW OF CHAPTER 11 .....................................................................................1

    A.    Information Regarding the Plan and Disclosure Statement. ...................................1
    B.    Representations. ....................................................................................................2

III. BACKGROUND & EVENTs LEADING TO FILING ....................................................2

IV. POST-PETITION PROCEEDINGS AND EVENTS......................................................4

    A.    Summary of Key Events Related to the Bankruptcy Case...................................4
    B.    Summary of Pre-Petition and Post-Petition Litigation. .......................................8

V. DESCRIPTION OF ASSETS AND LIABILITIES.........................................................8

    A.    The First Magnus Warehouse Loan Portfolio and Warehouse Debt ...................8
    B.    The Scratch and Dent Assets...............................................................................9
    C.    Cash and Other Assets Owned by First Magnus.................................................10
    D.    The Secured Claim of JP Morgan Chase ("Chase") ...........................................10
    E.    Summary of Unsecured Claims against First Magnus .........................................10

VI. FINANCIAL CONDITION AND ANALYSIS ................................................................10

    A.    Present Operations. ...............................................................................................10
    B.    Future Performance................................................................................................10

VII. SOURCES OF INFORMATION..................................................................................12

VIII. SUMMARY OF THE PLAN ........................................................................................12

    A.    Classification and Treatment of Claims and Interests.........................................12

IX. OVERVIEW OF ADDITIONAL PLAN PROVISIONS ..................................................14

    A.    Implementation of the Plan & Conditions to Effectiveness..................................14
    B.    Resolution of Claims, Demands, and Causes of Action. ......................................15
    C.    Treatment of Executory Contracts. ......................................................................16
    D.    Miscellaneous Plan Provisions.............................................................................17

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

i

**X.** LIQUIDATION ANALYSIS ................................................................................................18

**XI.** INCOME TAX CONSEQUENCES ....................................................................................18

**XII.** VOTING PROCEDURES AND REQUIREMENTS ..........................................................18

      A.     Parties Entitled to Vote. ..............................................................................18
      B.     Procedures for Voting. .................................................................................18
      C.     Summary of Voting Requirements ...............................................................19

**XIII.** CONFIRMATION OF THE PLAN ...................................................................................20

      A.     Confirmation Hearing. .................................................................................20
      B.     Objections to Confirmation. ........................................................................20
      C.     Requirements for Confirmation of the Plan. ...............................................20

**XIV.** ALTERNATIVES TO THE PLAN ....................................................................................23

**XV.** RECOMMENDATION AND CONCLUSION ...................................................................24

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

*PHX 327956879v8 10/15/2007*

# I.
# INTRODUCTION

FIRST MAGNUS FINANCIAL CORPORATION ("First Magnus" or the "Debtor"), the debtor in the above-referenced bankruptcy case, hereby submits its *Disclosure Statement in Support of Debtor First Magnus Financial Corporation's Plan for Liquidation* pursuant to 11 U.S.C. § 1125 (the "Disclosure Statement"). The purpose of this Disclosure Statement is to provide adequate information to the holders of claims or interests in this matter so that they may make an informed judgment in exercising their right to vote for acceptance or rejection of the *Plan of Liquidation File by First Magnus Financial Corporation dated October 15, 2007* (the "Plan"), a copy of which is attached hereto as Exhibit "1" and is incorporated herein by reference. **THE DEBTOR RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN IN ORDER TO MAXIMIZE THE RECOVERY OF YOUR CLAIM.**

Capitalized terms used in this Disclosure Statement will correspond to terms defined in the Plan and the Bankruptcy Code. Terms used in this Disclosure Statement that are also defined in the Plan are defined solely for convenience; and the Debtor does not intend to change the definitions of those terms from the Plan. If there is any inconsistency between the Plan and this Disclosure Statement, the Plan is, and will be, controlling.

# II.
# OVERVIEW OF CHAPTER 11

## A.    Information Regarding the Plan and Disclosure Statement.

The objective of a Chapter 11 case is the confirmation (*i.e.*, approval by the Bankruptcy Court) of a plan of reorganization or liquidation. A Chapter 11 plan describes in detail (and in language appropriate for a legal contract) the means for satisfying the claims against and equity interests in a debtor. After a plan has been filed, the holders of claims and equity interests are permitted to vote to accept or reject the plan. Before a debtor can solicit acceptances of its plan, however, Section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed judgment about the plan and about whether they should accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about the Debtors and the Plan to enable you to make an informed decision in exercising your right to accept or reject the Plan. Therefore, this Disclosure Statement provides relevant information about the Debtor, its property and financial condition, and the Plan.

This Disclosure Statement will be used to solicit acceptances of the Plan only after the Bankruptcy Court has entered an order approving this Disclosure Statement. Approval by the Bankruptcy Court of this Disclosure Statement means only that the Bankruptcy Court has found that this Disclosure Statement contains sufficient information for the Debtor to transmit the Plan and Disclosure Statement to Creditors and to solicit acceptances of the Plan.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA   85016
(602) 445-8000

*PHX 327956879v8 10/15/2007*

After the Bankruptcy Court has granted approval of this Disclosure Statement and there has been voting on the Plan, the Bankruptcy Court will conduct a Confirmation Hearing concerning whether the Plan should be approved. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code. The Bankruptcy Court also will receive and consider a ballot report prepared by the Debtor that will present a tally of the votes accepting or rejecting the Plan cast by those entitled to vote. Accordingly, all votes are important because they can determine whether the Plan will be confirmed. Once confirmed, the Plan is essentially a new contract between the Debtor and its Creditors and is binding on all Creditors and other parties-in-interest in the Debtor's Bankruptcy Case regardless of whether any particular Creditor voted to accept the Plan.

**THIS DISCLOSURE STATEMENT IS NOT THE PLAN. FOR THE CONVENIENCE OF CREDITORS AND HOLDERS OF EQUITY INTERESTS, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT. ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN ITSELF. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN WILL CONTROL.**

**B.      Representations.**

This Disclosure Statement has not been subjected to a certified audit; however, it has been prepared in part from information compiled by the Debtor from records maintained by it in the ordinary course of its businesses or from information received by the Debtor from third parties. Every effort has been made to be as accurate as possible in the preparation of this Disclosure Statement. Nevertheless, the inclusion of financial information in this Disclosure Statement and exhibits is subject to adjustment, and the Debtor reserves all rights to object to or challenge any Claims that are filed or asserted in the Case.

This is a solicitation by the Debtor only and is not a solicitation by its affiliates, attorneys, agents, financial advisors, or accountants.

**III.**
**BACKGROUND & EVENTS LEADING TO FILING**

First Magnus is headquartered in Tucson, Arizona. Prior to the commencement of the Bankruptcy Case, First Magnus successfully engaged in the business of originating, purchasing and selling primarily prime and Alt-A mortgage loans secured by one-to-four unit residences. First Magnus did very little sub-prime mortgage lending. Since its inception in October 1996 with twelve employees, First Magnus grew to become one of the nation's largest privately held mortgage companies through the recruitment of both strong loan originators and wholesale representatives while building a best-in-class processing platform. At the end of 2006, the audited financial statements for First Magnus reflected assets of approximately $1,106,690,011

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA  85016
(602) 445-8000

2

GREENBERG TRAURIG
LAW OFFICES
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

and shareholder equity of approximately $121,886,617. As of 2007, First Magnus had grown to over 5,500 employees, with a total of 335 branches, comprised of 277 retail and 58 wholesale locations nationwide.

As previously described in the *Declaration of Gupreet S. Jaggi in Support of the Debtor's Chapter 11 Petition and First Day Motions* (Docket No. 6), the mortgage industry in the United States has suffered an unprecedented liquidity crisis that has crippled many of the country's largest mortgage companies. The secondary mortgage markets have seen a similarly severe contraction in liquidity. The rapid and severe devaluation of mortgage backed securities and mortgage loan holdings was caused, in part, by a weakened housing market, falling real estate prices, homebuilder construction defaults, and a spike in consumer defaults and delinquencies on mortgage loan obligations.

The effects of this liquidity crisis have been sudden, catastrophic, and widespread. According to an October 4, 2007 report of the employment firm, Challenger, Gray & Christmas, mortgage lenders have eliminated 69,664 jobs this year, which accounts for more than half of the 130,000 jobs that have been cut in 2007 in the entire financial industry. Last month, Countrywide, the nation's largest mortgage lender, laid off 12,000 employees (or 20% of its work force).

Warehouse lenders across the country (including the Warehouse Lenders involved in this case) are suffering massive losses as a result of the liquidity crisis that has paralyzed the mortgage industry. For example, Merrill Lynch announced recently that it will be taking $4.5 billion in write downs attributable to the liquidity crisis in the mortgage industry and the sudden devaluation of mortgage backed securities. Wamu recently estimated that its 2007 Q3 earnings will be down 75% from last year, and Wamu is estimating loss reserves of approximately $975 million due largely to the liquidity crisis. Similarly, Countrywide recently announced that its mortgage originations have decrease 44% from last year, and Wall Street investment banks estimate that Countrywide will post a 2007 Q3 loss of over $600 million, compared to earnings in 2006 Q3 of over $650 million. In total, at least nine (9) major banks have announced that they will take write-downs, set aside funds, or take charges of roughly $21.8 billion related to sub-prime lending, weakened credit markets, and related leveraged debt. The Debtor is informed that Wamu has discontinued its mortgage warehouse lending operations.

First Magnus had been profitable through the date of its most recent financial statements, June 30, 2007, and was generally current on its debt obligations with creditors (and employees) as of the Petition Date. However, like many other mortgage lenders nationwide, the liquidity crisis prevented First Magnus from securing financing for continued operations. In the month prior to the filing of the Bankruptcy Case, shareholders of First Magnus Capital, Inc., the parent of First Magnus, made approximately $13 million in cash available to First Magnus in an unsuccessful attempt to sustain the company. Despite the cash infusion from the shareholders, First Magnus could not weather the liquidity crisis that has crippled the mortgage lending industry, and was forced to cease its mortgage origination business, close hundreds of

3

retail and wholesale offices around the country, and terminate the vast majority of its 5,500 employees.

Joining the ranks of over 200 mortgage companies that have ceased operations in the last year, First Magnus filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Arizona on August 21, 2007. Since its Chapter 11 filing, the Debtor has been winding down its affairs initially with approximately 157 Retained Employees. As of the filing of this Disclosure Statement just over seven (7) weeks into the Bankruptcy Case, the number of Retained Employees has been reduced by over sixty percent (60%) to approximately 66 in number. Several members of the Debtor's management team have been working full time with no compensation to ensure that creditors (including former employees) receive substantial recoveries through an orderly liquidation of the Assets of the bankruptcy Estate.

## IV.
## POST-PETITION PROCEEDINGS AND EVENTS

**A.** **Summary of Key Events Related to the Bankruptcy Case.**

While more detailed information related to the events in the Bankruptcy Case can be obtained by assessing the Bankruptcy Court's CM/ECF filing system and reviewing the pleadings filed in Case No. 4:07-bk-01578, the following is a summary of certain key bankruptcy-related proceedings and events associated with this Bankruptcy Case:

**1.** **Filing of Bankruptcy Petition.** On August 21, 2007 (the "Petition Date"), First Magnus filed a voluntary Chapter 11 bankruptcy petition with the United States Bankruptcy Court for the District of Arizona. This bankruptcy case is currently being administered under Bankruptcy Case No. 4:07-bk-01578.

**2.** **First Day Motions.** The following Motions were filed by First Magnus on the Petition Date, and were heard by the Bankruptcy Court on August 29, 2007:

**(a)** **Wage Motion.** On August 21, 2007, the Debtor filed the *Motion for Order Authorizing the Payment of Pre-Petition Employee Wages, Salary, and Other Compensation and Authorizing Banks to Honor Checks for Employee Obligations* (Docket No. 7), pursuant to which the Debtor sought authorization: (i) to immediately pay all unpaid pre-petition Employee Obligations up to $10,000 per Retained Employee; (ii) to pay up to $10,000 of pre-petition Employee Obligations for the each Former Employee when adequate funds become available; and (iii) to pay prepetition Employee Obligations of approximately $8,333 each to five officers who are also Retained Employees. Pursuant to an Amended Order dated September 7, 2007 (Docket No. 136), the court granted the motion in part and denied the motion in part. The court authorized the Payment of Pre-Petition Employee Wages for the Retained Employees, subject to certain exclusions, with unencumbered funds or with the cash collateral of Washington Mutual. The Wage Motion was denied as to payment of Former Employees outside of the context of a plan of reorganization. To assist Former Employees in the Tucson area cope with the hardship that was caused by the unexpected and abrupt need of

4

*PHX 327956879v8 10/15/2007*

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA  85016
(602) 445-8000

the Debtor to cease operations, several of the Debtor's owners and management team displayed compassion and responsibility that may be unmatched in the history of Chapter 11 cases by creating with their own money a $1.2 million fund which has provided $2,000 stipends to each of the local Former Employees.

      **(b)**    <u>**Utilities Motion.**</u> On August 21, 2007, the Debtor filed the *Motion for Order (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service (II) Deeming Utility Companies Adequately Assured, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance* (Docket No. 8) to ensure uninterrupted utility services as the company continues its business operations and the winding-down of its affairs. The motion was granted pursuant to an Order issued on September 7, 2007 (Docket No. 132).

      **(c)**    <u>**Retention of Debtor's Financial Advisor**</u>. On August 21, 2007, the Debtor filed the *Application for an Order Under 11 U.S.C. § 327(A) Authorizing the Retention and Employment of MCA Financial Group, Ltd. as Financial Advisor to First Magnus Financial Corporation* (Docket No. 9) to assist with an orderly liquidation of the company's assets. On or about September 7, 2007, Debtor was authorized on an interim basis to retain MCA Financial Group, Ltd. ("<u>MCA</u>"), subject to a monthly cap of $75,000 (Docket No. 131). The employment of MCA thereafter was approved on a final basis by the Bankruptcy Court. The fees and expenses for MCA Financial Group, Ltd. are subject to the approval of the Bankruptcy Court.

      **(d)**    <u>**Retention of Debtor's Counsel.**</u> On August 21, 2007, the Debtor filed the *Application for an Order Under 11 U.S.C. § 327(A) Authorizing the Retention and Employment of Greenberg Traurig, LLP as General Counsel to First Magnus Financial Corporation* (Docket No. 11) to perform legal services for the Debtor which may be necessary and proper in these proceedings, including provide legal advice with respect to the powers and duties of a debtor-in-possession; to prepare necessary legal papers; to appear in court and to assist with any disposition of assets by sale or otherwise. On or about September 7, 2007, Debtor was authorized on an interim basis to retain Greenberg Traurig, LLP ("<u>GT</u>") as its general counsel in connection with the bankruptcy case (Docket No. 133). The employment of GT thereafter was approved on a final basis by the Bankruptcy Court. The fees and expenses for GT are subject to the approval of the Bankruptcy Court.

      **(e)**    <u>**Knudsen Motion**</u>. On August 21, 2007, the Debtor filed the *Motion for Order Establishing Interim Fee Application and Expense Reimbursement Procedures* (Docket No. 13, the "<u>Knudsen Motion</u>") seeking the court's authorization to establish billing and payment procedures for retained professionals and notification procedures for creditors regarding the billing and payment. The Bankruptcy Court refused to approve the Knudsen Motion.

      **3.**    <u>**Appointment of Creditors' Committee and Retention of Committee Counsel.**</u> Pursuant to an Order dated August 30, 2007 (Docket No. 67) and an Amended Order dated September 14, 2007 (Docket No. 173), the United States Trustee appointed a committee

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

5

PHX 327956879v8 10/15/2007
Case 4:07-bk-01578-EWH    Doc 369    Filed 10/15/07    Entered 10/15/07 16:23:25    Desc
Main Document     Page 8 of 33

of the unsecured creditors of First Magnus. Michael D. Warner and the Warner Stevens law firm was retained and approved by the Bankruptcy Court as the attorney for the Official Committee of Unsecured Creditors.

**4.    The DIP Financing Motion.**    The Debtor sought permission from the Bankruptcy Court to borrow up to $15,000,000 in order to continue limited operations and wind-down the affairs of the company. Pursuant to an Order dated September 7, 2007 (Docket No. 137), the Bankruptcy Court denied the DIP Financing Motion, but allowed the Debtor to use up to $1,300,000 in cash on hand, some of which was subject to lien and related claims asserted by Secured Creditors and Repo Participants in the case.

**5.    The real property and personal property lease rejection motion.**    On or about August 31, 2007, the Debtor filed the *Emergency Motion for an Order: (A) Terminating Month-to-Month Real Property Leases; (B) Rejecting Non-Residential Real Property Leases; and (C) Establishing Procedures for Rejection, Sale or Abandonment of Personal Property* (Docket No. 72, the "Lease Rejection/Abandonment Motion"). Through the Lease Rejection/Abandonment Motion, the Debtor sought to shed itself of hundreds of real property and personal property leases that cost the Debtor over $2,200,000 per month in rental charges, and the Debtor sought to abandon owned personal property, which has inconsequential value in light of the $6 million Secured Claim asserted by JP Morgan Chase. The Bankruptcy Court granted the Lease Rejection/Abandonment Motion pursuant to an Order dated September 8, 2007 (Docket No. 142).

**6.    Proposed Sale of Certain Assets.**

**(a)    The sale of certain unencumbered loans and REO properties to Summit.**    On or about September 13, 2007, the Debtor filed the *Emergency Motion of First Magnus Financial Corporation for an Order Authorizing and Approving Sale of Loan and REO Real Estate Assets Free and Clear of all Interests* (Docket No. 169, the "Summit Sale Motion"), pursuant to which the Debtor proposed to sell certain construction loans with a total principal amount outstanding of approximately $8,483,760 and continued funding obligations, if any, as well as certain real estate owned ("REO") by First Magnus, to Summit Investment Management, LLC, a Colorado limited liability company or its assigns ("Summit"). The initial purchase price of $6,413,000 was reduced to approximately $5,723,500 based on the sale of five (5) REO properties prior to the hearing on the Summit Sale Motion. Summit will also assume and perform all of First Magnus' obligations under the construction loans. The Summit Sale Motion subject to higher and better offers, was heard by the Bankruptcy Court on October 2, 2007. In a Memorandum Decision Re: Sale of Assets dated October 3, 2007 (Docket # 298), the Bankruptcy Court approved the Summit Sale Motion, and thereby paved the way toward an orderly liquidation of the Debtor.

**(b)    The sale of the unencumbered commercial lot in Tucson.**    On or about October 15, 2007, Debtor expects to file the *Motion of First Magnus Financial Corporation for an Order Authorizing and Approving Sale of Real Property Free and Clear of all Interests* (the "Commercial Lot Sale Motion"), pursuant to which Debtor proposes to sell a

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

6

commercial lot containing approximately 105,979 square feet in Tucson, Arizona, to Rynoke, LLC, an Arizona limited liability company or its assigns, for $1,600,000. The Commercial Lot Sale Motion will be subject to higher and better offers. The Debtor expects that a hearing will be set on the Commercial Lot Sale Motion in early to mid-November 2007.

(c)  **The sale of encumbered loans to Steel Mountain.** The Debtor has signed a letter of intent to sell in the ordinary course of its business certain mortgage loans to Steel Mountain Capital Management, LLC for approximately $61,000,000 (the "Steel Mountain Sale"), subject to various adjustments. The mortgage loans included in the Steel Mountain Sale are subject to various claims made by certain Warehouse Lenders, including UBS and Countrywide. The Steel Mountain Sale will result in a substantial pay down of Claims of UBS and Countrywide, and it will enhance the possibility of recovery of some equity (or "haircuts") from the Debtor's loan portfolios, for ultimate distributions to unsecured creditors in the Bankruptcy Case.

7.  **The Decision By WAMU To Retain Its Loans, To Relieve The Estate Of Any Deficiency Liability, And To Return To The Estate Free And Clear Of Liens And Interests Loans With A Book Value Of $3.15 Million** . Pursuant to the WAMU EPA Repurchase Agreement and the WAMU Commercial Paper Repurchase Agreement with First Magnus, effective as of September 27, 2007, WAMU provided notice that it intended to keep for its own account of all of its warehoused loans that were originated by the Debtor. In relation to the notice, WAMU waived it right to assert any claim against the Debtor, if WAMU is not able to obtain a full repayment of its warehouse facilities through a commercially reasonable sale of the loans, and WAMU returned to the Debtor approximately $3,150,000 in estate loans that WAMU was holding. As a consequence, approximately $1,100,000,000 in claims asserted by WAMU have been resolved, and WAMU will not assert any Claims in the Bankruptcy Case with respect to its Early Purchase and Commercial Paper facilities.

8.  **Motions by First Magnus to Retain Professionals and to Sell Assets in the Ordinary Course of its Business.** On September 21, 2007, the Debtor filed its *Motion to Employ Ordinary Course Professionals and Establish Procedures for Employment of Ordinary Course Professionals* (Docket # 211, the "Ordinary Course Professionals Motion"). Through the Ordinary Course Professionals Motion, the Debtor seeks authority to employ and pay professionals (mostly attorneys and accountants) that provide ordinary and necessary legal services (primary foreclosure and eviction assistance) tax services (including a needed audit of the 401K program maintained by the Debtor for its employees. The Ordinary Course Professional Motion was approved in part and denied in part by the Bankruptcy Court following a hearing on October 2, 2007.

9.  **Stay Relief and Turnover Motions Filed by or against Creditors in the Bankruptcy Case.** Within the last two weeks, Countrywide has filed a spate of stay relief motions aimed at foreclosing on properties subject to loans now in default that were originated by First Magnus prior to the Petition Date. The Debtor does not believe that it has any current interest in the loans that are the subject of the stay relief motions, and the Debtor and Countrywide are negotiating appropriate resolutions of the motions. Bank of America

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

7

("BofA") filed a motion recently seeking a turnover of loans that it claims to have purchased from the Debtor, and the Debtor has reached an agreement to obtain a turn over of cash that has been deposited post petition in an account maintained by National Bank of Arizona ("NBA"). The BofA and NBA matters are being handled by conflicts counsel for the Debtor (the Osborn Maledon firm), and resolution of the matters is expected shortly.

## B.   Summary of Pre-Petition and Post-Petition Litigation.

**1.   Pre-Petition Litigation.** Prior to the Petition Date, First Magnus was involved in various pieces of litigation, both as a defendant and as a plaintiff. A summary of the pre-petition litigation involving First Magnus is attached as Exhibit 4a to the "Statement of Financial Affairs" (the "SOFA") that was filed by the company on September 14, 2007. (Docket No. 177.) Litigation involving First Magnus as a defendant has been stayed, and to date no party has requested stay relief to continue its litigation against the Company. Litigation involving First Magnus as a plaintiff will be pursued by the Liquidating Trustee in its discretion.

**2.   Post-Petition Litigation.**

**(a)   WARN Act Complaint.** On or about August 30, 2007, a complaint was filed by several former employees of First Magnus seeking class certification and damages (60 days' of wages) under the WARN Act (29 U.S.C. §2104). The WARN Act litigation filed in the First Magnus case (Adversary No. 4-07-ap-60) is functionally identical litigation filed in the case of another mortgage lender who was crippled by the mortgage industry liquidity crisis, American Home Mortgage (by the same plaintiff's law firm that filed the WARN Act complaint against First Magnus). A pleading responsive to the WARN Act complaint is due by October 31, 2007, and First Magnus expects to contest the claims raised in the WARN Act complaint.

**(b)   Certain Regulatory Matters.** Prior to and since the commencement of the Bankruptcy Case, First Magnus has been the subject of a few regulatory and investigative proceedings. In response to prepetition and post petition regulatory proceedings, and in light of its inability to continue operating, First Magnus has surrendered nearly all of its mortgage broker and banking licenses to the appropriate state regulatory agencies. First Magnus believes that ceasing business operations and surrendering the licenses will in large part curtail the regulatory and investigative proceedings. To the extent that such is not the case, First Magnus or the Liquidating Trustee will engage counsel to assist in any such regulatory and investigative matters that may require attention in the effort to minimize any impact upon the assets of First Magnus.

## V.
## DESCRIPTION OF ASSETS AND LIABILITIES.

**A.   The First Magnus Warehouse Loan Portfolio and Warehouse Debt**. To finance its mortgage loan production business, First Magnus used several warehouse financing arrangements that primarily took the form of master repurchase agreements (collectively, the

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA  85016
(602) 445-8000

8

"Repurchase Agreements") with certain lenders (collectively, the "Warehouse Lenders"). Typically, First Magnus would fund a mortgage loan through a combination of funds provided by Warehouse Lenders along with its own funds (which in the mortgage industry is known as a "haircut"). Warehouse Lenders required First Magnus to contribute a haircut to fund loans in order to protect the Warehouse Lenders from loan defects, loan defaults, and other credit risks, including market swings. The table below summarizes the obligations of First Magnus to its Warehouse Lenders under Repurchase Agreements or other credit facilities as of the Petition Date:

| FACILITY | TOTAL OUTSTANDING (Funded Loans) | WAREHOUSE COMPONENT | HAIRCUT |
|---|---|---|---|
| Washington Mutual Syndicated Repurchase Agreement | $225,277,093 | $194,227,684 | $31,049,409 |
| Washington Mutual Early Purchase Agreement | $70,896,971 | $55,248,061 | $15,648,910 |
| Washington Mutual Commercial Paper Agreement | $1,059,877,632 | $1,040,889,850 | $18,987,782 |
| Countrywide Revolving Line of Credit | $41,960,957 | $28,998,347 | $12,962,610 |
| UBS Repurchase Agreement | $211,569,314 | $198,515,177 | $13,054,137 |
| Merrill Lynch Repurchase Agreement | $61,123,420 | $42,313,002 | $18,810,418 |
| Totals | $1,670,705,387.00 | $1,560,192,121.00 | $110,513,266.00 |

**B.    The Scratch and Dent Assets.** A small percentage of First Magnus' loans contained defective documentation or other problems (e.g., a missing HUD statement, a document that is not notarized or some other documentary defect) and historically could be sold immediately like other loans originated by First Magnus. These defective loans are known in the mortgage lending industry as "scratch and dent loans." Historically, First Magnus was able to sell scratch and dent loans at par (i.e., 100% of the principal amount outstanding under the loan), but now with the liquidity crisis, First Magnus was and is forced to sell the scratch and dent loans below par, often to the point where the company could not absorb the loss on the scratch and dent loans or generate enough liquidity from their sales to continue operating. A very small percentage of First Magnus' historical originations have been scratch and dent loans. A certain amount of loans originated and sold by First Magnus are returned (or put back) to First Magnus based on an EPD, EPO or some other defect or breach of a representation or warranty specified in the Loan Purchase Agreement. Certain EPDs, EPOs, scratch and dent loans, or other loans that First Magnus has not been able to sell occasionally wind up in foreclosure and become real estate owned ("REO") holdings for First Magnus. Scratch and dent loans, EPDs, EPOs, REO, and certain other assets (collectively, the "Scratch and Dent Assets") owned by First Magnus at some point become ineligible for financing provided by the Warehouse Lenders under Repurchase Agreements and other financing devices described above. As of the Petition Date, First Magnus had on its books approximately $51 million of the Scratch and Dent Assets. As

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

9

of the Petition Date, the Scratch and Dent Assets were financed by First Magnus Capital under a facility that had approximately $25,000,000 advanced.

**C.    Cash and Other Assets Owned by First Magus.**    In addition to the Warehouse Loan Portfolio and the Scratch and Dent Assets, First Magnus held as of the Petition Date: (i) cash on hand in the approximate amount of $3.8 million, a certain percentage of which was (and is) subject to claims of the company's Warehouse Lenders; (ii) a relatively small amount of income from loans currently owned by First Magnus (under $70,000 per month); (iii) intellectual property rights in mortgage processing software that has been the subject of several inquiries by prospective buyers; (iv) the commercial lot referenced in §IV(A)(6) above; and (v) miscellaneous litigation claims referenced in §IV(B) above.

**D.    The Secured Claim of Chase.**    Chase has a $6 million Claim under two loan facilities secured by a lien on certain furniture, fixtures, and equipment (collectively, the "Chase Equipment"). The Chase Equipment is located at approximately 90 leased sites. The Debtor has provided (and continues to provide) reasonable assistance to Chase with respect to the retrieval of the Chase Equipment, including a list of the sites where Chase Equipment was located, pursuant to an Order dated September 8, 2007 (Docket No. 142). Chase is responsible for the retrieval of the Chase Equipment.

**E.    Summary of Unsecured Claims against First Magnus.**    In addition to the amounts owing to Warehouse Lenders, First Magnus also owes approximately $93 million of unsecured debt, including approximately: (i) $13.5 million of accrued payroll and related costs; (ii) $24.4 million of accounts and notes payable; (iii) $35 million owed to First Magnus Capital; and (iv) $20 million of subordinated unsecured debt owed to insiders.

## VI.
## FINANCIAL CONDITION AND ANALYSIS

**A.    Present Operations.**

The Debtor has ceased its business operations, with the exception of the operations directly related to the liquidation and wrapping up of the company. The number of employees retained after the Petition Date has been reduced, as follows: 154 retained as of 8/31; 135 retained as of 9/7; 125 retained as of 9/14; 110 retained as of 9/21; 88 retained as of 9/28; 74 retained as of 10/5; and 66 as of 10/12. Future reductions in force are planned as the liquidation of First Magnus is accomplished.

**B.    Future Performance.**

**1.    Liquidation of Loan Portfolios, REO Properties, miscellaneous personal property, and litigation claims.** Attached hereto as Exhibit "2" is a copy of the Wind Down Budget (the "Projection") prepared by the Debtor based on its own experience, along with input from MCA Financial Group, Ltd., the Court-approved financial advisors for the Debtor ("MCA"). As can be seen from the attached Projection, the Debtor anticipates a distribution of $28-44 million to Unsecured Creditors net of liquidation expenses and depending on whether

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

10

the liquidation needs to be completed before or after end of 2007. Additional recoveries for Unsecured Creditors may be provided through the capture of equity following the sale of the remaining portions of the Warehouse Loan Portfolio, the sale of certain intellectual property, and litigation recoveries obtained by First Magnus.

**2. Potential Surcharge Claims Against Warehouse Lenders, Chase, and Other Creditors.** Since the Petition Date, thousands of loans and a considerable amount of personal property have been stored, processed, protected and preserved by First Magnus for the benefit of Warehouse Lenders and Chase. Attached as Exhibit "3" are selected pictures of the loan and file storage, preservation, and processing that continues to be performed by First Magnus for the benefit of Warehouse Lenders. The Debtor estimates that over 7,000 warehoused loans have been stored, preserved, and processed at the First Magnus headquarters in Tucson post petition by employees of the Debtor (and in the case of WAMU, by approximately 40 former First Magnus employees who were hired by WAMU to complement the Debtor's employees). The chart below summarizes some of the results of efforts undertaken post petition by the Debtor with respect to the protection, preservation, and disposition of collateral or assets of the Warehouse Lenders:

| WAREHOUSE FACILITY | PREPETITION OUTSTANDING | POST-PETITION LOANS SOLD/ PAID OFF | POST-PETITION LOAN SALE COMMITMENTS RETENTIONS[1] | REMAINING BALANCE |
|---|---|---|---|---|
| UBS Repo | $198,695,626 | $33,718,309 | $140,720,068 | $24,257,248 |
| Countrywide EPP | $16,219,921 | $6,220,017 | $0 | $9,999,904 |
| Countrywide Hosp | $28,496,747 | $183,876 | $28,312,871 | $0 |
| WAMU EPA | $55,248,061 | $763,333 | $54,484,728 | $0 |
| WAMU CP | $1,038,993,070 | $0 | $1,038,993,070 | $0 |
| WAMU Syndicate | $194,227,684 | $0 | $0 | $194,227,684 |
| Merrill Lynch | $42,313,002 | $6,266,667 | $0 | $36,046,335 |
| **Totals** | **$1,574,194,111.00** | **$47,152,202.00** | **$1,262,510,737.00** | **$264,531,171.00** |

There is considerable legal uncertainty surrounding the surcharge of Warehouse Lenders whose financing was provided to First Magnus through repurchase agreements. There is little doubt, however, that benefits have been bestowed by First Magnus post petition for each of its Warehouse Lenders and Chase, who should be responsible for shouldering a portion of the cost of the First Magnus bankruptcy case until such time as the loan portfolios and the personal property are removed from the First Magnus premises by each Warehouse Lender, Chase, and any other creditor that claims an interest in property that is being protected, preserved, and disposed of by the Debtor.

---

[1] All claims of Wamu under the Wamu EPA Repurchase Agreement and the Wamu Commercial Paper Repurchase Agreement are resolved, and there will be no Claim asserted against the Estate with respect to those warehouse facilities. A large portion of the UBS and Countrywide warehouse loans are the subject of pending sales in the ordinary course of business. There is no assurance that the sales of UBS and Countrywide loans to Steel Mountain will close, but closings of the sales (if they occur) are expected in the next 2-6 weeks.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

11

# SOURCES OF INFORMATION

The financial information contained in this Disclosure Statement is derived from a number of sources. Values ascribed to First Magnus' Assets were provided by the Debtor. The Projection was prepared by MCA based on information received from the Debtor. Information on Claims of Creditors was obtained from the financial records of the Debtor, the monthly operating reports, the statements and schedules on file in the Bankruptcy Case, proofs of claims filed by Creditors in the Bankruptcy Case, and loan documents evidencing the Claims of Secured Creditors.

The information contained in this Disclosure Statement represents the Debtor's best estimate in light of current market conditions and past experience. Other information obtained by the Debtor represents informal opinions or appraisals as to value. All the information provided is subject to change and represents the best information available at the time, the actual results may differ.

# VIII.
## SUMMARY OF THE PLAN

The following provides a summary of the overall structure and classification of claims against or interests of or in the Debtor and is qualified in its entirety by reference to the Plan, which is attached hereto as Exhibit "1" and is incorporated herein by reference. The statements in this Disclosure Statement include summaries of the provisions contained in the Plan and the documents referred to therein. This summary does not purport to be a precise or complete statement of all terms in the Plan or documents referred to therein, and reference is made to the Plan for the full and complete statement of such terms. The Plan and documents referred to therein control the treatment of Claims against and Equity Interests of and in the Debtor and other parties-in-interest. Certain of the documents referred to in the Plan are not executed, with execution to occur upon Confirmation of the Plan or upon the Effective Date. The final form of such documents may therefore vary.

**A.** **Classification and Treatment of Claims and Interests.**

**1.** **Administrative Claims.** Administrative Claims are not classified under the Plan. Nevertheless, pursuant to Bankruptcy Code §1129(a)(9), all Allowed Administrative Expense Claims will be paid on the Effective Date. Most of the Debtor's post petition operating expenses have been paid on a current basis. Thus, Administrative Expenses Claims largely will consist of the Fee Claims of estate Professionals. As of October 1, 2007, the following fees and costs had been incurred by estate Professionals: (i) Greenberg Traurig, general bankruptcy counsel for the Debtor: approximately $350,000; (ii) Osborn Maledon, conflicts counsel for the Debtor: approximately $50,000; (iii) MCA, financial advisors for the Debtor: approximately $200,000; (iv) Warner Stevens, counsel for the Creditors Committee: approximately $177,500.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

**2.    Pre-petition Employee Wage Claims, Commissions, and Flex Account Payments.** Class 1 of the Plan consists of Non-Tax Priority Claims asserted against the Debtor. For the most part, Class 1 will consist of the Claims of former employees for: (i) wages and commissions that are entitled to priority under Bankruptcy Code §507(a)(4) (estimated in an aggregate amount of approximately $11,534,000); and (ii) employee benefits and related claims, including medical and dependent care flex payment deposits (estimated in an aggregate amount of approximately $903,000). The Plan contemplates payment in full of all Class 1 Allowed Claims on the Effective Date. Class 1 claims are unimpaired under the Plan.

**3.    Secured Claims.** Class 2 of the Plan consists of the Claims of Secured Creditors, including Countrywide and Chase. Each Secured Creditor will occupy a separate subclass under Class 2 of the Plan, and each Secured Creditor will receive in full satisfaction of its Allowed Claim: (i) cash on or before the Effective Date from the sale of any Assets subject to a Lien of the Secured Creditor; (ii) abandonment of any Assets subject to a Lien of the Secured Creditor; or (iii) such other treatment agreed to by the Secured Creditor. Based on current projections, the Debtor expects to be able to pay in full the holders of Allowed Secured Claims (or obtain waivers of deficiency Claims from holders of Allowed Secured Claims) other than the Allowed Secured Claim of Chase. Class 2 Claims are impaired under the Plan.

**4.    General Unsecured Claims (Other than Rejection Claims).** Class 3 of the Plan consists of the Claims of holders of Unsecured Claims other than Unsecured Claims that arise out of the rejection of executory contracts or unexpired leases of the Debtor. The Debtor estimates that holders of Class 3 Unsecured Claims will consist primarily of: (i) $24.4 million of accounts and notes payable; and (ii) $35 million owed to First Magnus Capital. Based on current Projections, the Debtor estimates that $16-32 million from the Dividend Fund will be available for payment of Class 3 and Class 4 Allowed Claims on a pro rata basis. Class 3 Claims are impaired under the Plan.

**5.    General Unsecured Claims Arising Out of the Rejection of Executory Contracts and Unexpired Leases.** Class 4 of the Plan consists of the Claims of holders of Unsecured Claims that arise out of the rejection of executory contracts or unexpired leases of the Debtor. Presently, the Debtor is not capable of determining the amount of Unsecured Claims that will arise out of the rejection of executory contracts or unexpired leases of the Debtor. WNS of North America ("WNS") has stated in hearings and pleadings submitted to the Bankruptcy Court that it expects to have a rejection damages claim of $30,000,000. The Debtor disputes that WNS will have a rejection damages claim any where near the $30,000,000 quoted by WNS, and cause may exist to subordinate any claim of WNS because it likely arises out of an agreement to purchase a security of an affiliate of the Debtor. In any event, the estimates that $16-32 million from the Dividend Fund will be available for payment of Class 3 and Class 4 Allowed Claims on a pro rata basis. Class 4 Claims are impaired under the Plan.

**6.    Claims of Wamu under the Wamu EPA Repurchase Agreement and the Wamu Commercial Paper Repurchase Agreement.** Class 5 of the Plan consist of the Claims of Wamu under the Wamu EPA Repurchase Agreement and the Wamu Commercial Paper Repurchase Agreement. In full satisfaction of its approximately $1.1 billion Class 5

13

Claim, Wamu will keep for its own account of all of the loans purchased by Wamu pursuant to the Wamu EPA Repurchase Agreement and the Wamu Commercial Paper Repurchase Agreement which were owned by Wamu on the Effective Date, Wamu will return to the Debtor approximately $3,150,000 in loans identified in the letter dated September 12, 2007 from Wamu to the Debtor, and Wamu will not assert any Claims in the Bankruptcy Case with respect to the Wamu EPA Repurchase Agreement and the Wamu Commercial Paper Repurchase Agreement. Class 5 Claims are impaired under the Plan.

       **7.**    **Claims of Repo Participants under Repurchase Agreements.** Class 6 of the Plan consists of the Claims of Repo Participants under Repurchase Agreements (including UBS, Merrill Lynch, and Wamu if and to the extent that they assert Claims under Repurchase Agreements) (collectively, the "Class 6 Repo Participants"), other than the Class 5 Claim of Wamu. Under the Plan, the Claims of the Class 6 Repo Participants shall have the right to liquidate Mortgages under Repurchase Agreements and shall deliver any excess of the market prices received on liquidation of such Mortgages over the sum of the repurchase price provided for in the applicable Repurchase Agreement and all reasonable expenses incurred in connection with the liquidation of Mortgages.. Class 6 Claims are impaired under the Plan.

       **8.**    **Claims of Subordinated Creditors.** Class 7 consists of Creditors whose claims are subordinated pursuant to Section 510 of the Bankruptcy Code. The Debtor estimates that the Class 7 Subordinated Creditors will consist of: (i) $20 million of subordinated unsecured debt owed to insiders of the Debtor; and (ii) any Claim asserted by WNS if and to the extent that the WNS Claim arises out of its purchase of a security in an affiliate of the Debtor. No distribution will be made in respect of the Class 7 subordinated Claims. Therefore, Class 7 is impaired under the Plan, and is deemed to have voted against confirmation of this Plan.

       **9.**    **Equity Security Interests.** Class 8 of the Plan consists of the holders of Equity Security Interests in the Debtor. The holders of Equity Security Interests in the Debtor will not receive any distribution under the Plan. Therefore, Class 8 is impaired under the Plan, is deemed to have rejected the Plan.

**IX.**
**OVERVIEW OF ADDITIONAL PLAN PROVISIONS**

       The following description of the Plan is for informational purposes only and does not purport to change or supersede any of the specific contractual language of the Plan. Each holder of a Claim or Equity Interest is urged to read the Plan carefully with respect to the Debtor's proposed treatment of their respective Claim or Equity Interest, and, if necessary, to consult with legal counsel to understand the Plan fully. The Plan, if confirmed, will be binding upon the Debtor, its Creditors, and the holders of Equity Interests. **IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN WILL CONTROL.**

**A.**    **Implementation of the Plan & Conditions to Effectiveness.**

       The means of execution of the Plan are and will be as follows:

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

14

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1. **Conditions Precedent to Occurrence of Effective Date.** It is a condition of the Effective Date that the Confirmation Order has been entered by the Bankruptcy Court and has become a Final Order. The Debtor, in his sole discretion, may waive the Final Order condition at any time from and after the Confirmation Date. In that event, the Debtor will be entitled to render any or all of their performance under the Plan prior to what otherwise would be the Effective Date if the above-referenced conditions were not waived, including, but not limited to, the right to perform under any circumstances that would moot any appeal, review, or other challenge of any kind to the Confirmation Order if the Confirmation Order is not stayed pending such appeal, review, or other challenge.

2. **Appointment of Liquidating Trustee and Litigation Trustee.** On the Effective Date, Morris C. Aaron will be appointed as the Liquidating Trustee. Attached to this Disclosure Statement as Exhibit "4" is a statement of qualifications for Mr. Aaron and his company, MCA Financial Group, Ltd. As can be seen from his statement of qualifications, Mr. Aaron along with other members of his company, MCA, has extensive liquidation experience as a financial advisor, as a state court receiver, and as a Chapter 7 trustee. The powers and duties of the Liquidating Trustee are set forth in the *Liquidating Trust Agreement* which is attached hereto as Exhibit "5." The Liquidating Trustee will liquidate the Remaining Assets of the Estate other than Estate Tort and Chapter 5 Claims. Before the Confirmation Date, the Committee will select the Litigation Trustee who, pursuant to the terms of a Liquidating Trust Agreement, will prosecute or settle the Estate Tort and Chapter 5 Claims. Both the Liquidating Trustee and the Litigation Trustee will consult with an Advisory Board consisting of two (2) members selected by the Committee and one (1) member selected by the Debtor prior to the Confirmation Date.

3. **Quarterly Operational Reports.** The Liquidating Trustee will be required to provide a quarterly report of the Debtor's operations commencing on the first Business Day of the first full calendar quarter following the entry of the Confirmation Order, and on the first Business Day of each calendar quarter thereafter until the case is closed.

B. **Resolution of Claims, Demands, and Causes of Action.**

1. **Preservation of Debtor's Claims, Demands, and Causes of Action.** All claims, demands, and causes of action of any kind or nature whatsoever held by, through, or on behalf of the Debtor and/or the Estate against any other Person, including, but not limited to, all Avoidance Actions, actions to subordinate claims under §510 of the Bankruptcy Code, and all claims for indemnification or contribution whereby a Debtor is the indemnitee, arising before the Effective Date and that have not been resolved or disposed of prior to the Effective Date, are hereby preserved in full for the benefit of the Debtor and the Liquidating Trustee will own and retain, and may prosecute, enforce, compromise, settle, release, or otherwise dispose of, any and all claims, defenses, counterclaims, setoffs, and recoupments belonging to the Debtor or the Estates.

2. **Procedure for Determination of Claims.**

15

(a) **Objections to Claims.** Except as to any Claim that has been Allowed prior to the Effective Date, the Debtor or the Liquidating Trustee may object to the allowance of any Claim against the Debtor or seek estimation thereof on any Claim.

(b) **Disputed Claims.** No payments or other distributions will be made to holders of Claims unless and until such Claims are Allowed Claims pursuant to a Final Order. If a Claim is not an Allowed Claim by or on the Effective Date or when payment is otherwise due under the Plan, payment of the Allowed Claim will be made when a Claim becomes an Allowed Claim after the Effective Date or as otherwise specifically provided in the Plan.

(c) **Treatment of Contingent Claims.** Until such time as a contingent Claim or a contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to distributions under the Plan. The holder of a contingent Claim will only be entitled to a distribution under the Plan when and if such contingent Claim becomes an Allowed Claim.

**3. Administrative Claims Bar Date.** Administrative expense proofs of claim (or, for Professional Charges, fee applications) requesting payment of administrative costs and expenses incurred prior to the Effective Date pursuant to Sections 507(a)(1) and 503(b) of the Bankruptcy Code must be served and filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date; provided, however, that proofs of claim will not be required with respect to any unpaid post-petition operating expenses incurred in the normal course of the Debtors' businesses prior to the Effective Date. Any such Claim that is not served and filed within this time period will be forever barred. Any Claims for fees, costs, and expenses incurred by any Chapter 11 Professionals after the Confirmation Date will be paid in the ordinary course of the Debtors' businesses.

## C. **Treatment of Executory Contracts.**

**1. Assumption of Executory Contracts.** The Debtor does not expect to assume any executory contracts.

**2. Rejection of Executory Contracts.** Unless otherwise specifically set forth herein, all executory contracts not previously rejected by prior Court order or by a motion for rejection filed prior to the first day of the Confirmation Hearing will be rejected by the Debtor pursuant to the Confirmation Order.

**3. Assumption of Other Executory Contracts.** Before the Confirmation Hearing, the Debtor may file one or more motions identifying any Executory Contracts that it intends to assume as of the Effective Date; and such motions and the Bankruptcy Court's orders thereon will be deemed incorporated in the Plan. All Executory Contracts not otherwise assumed as provided herein will be rejected as of the Confirmation Date.**Rejection Claims Bar Date.** Every Claim asserted by a Creditor arising from the rejection of an Executory Contract must be filed with the Bankruptcy Court no later than the first Business Day that is thirty (30)

*PHX 327956879v8 10/15/2007*

16

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA  85016
(602) 445-8000

days after the Effective Date. Every such Claim that is timely filed will be treated under the Plan as a General Unsecured Claim. Every such Claim that is not timely filed by the deadline stated above will be forever barred, unenforceable, and discharged, and the Creditor holding the Claim will not receive or be entitled to any distribution under the Plan on account of such Claim.

**D.    Miscellaneous Plan Provisions.**

     **1.    Retention of Jurisdiction.**  As described in detail in the Plan, the Plan provides for the retention of jurisdiction by the Bankruptcy Court over various aspects of the Debtor's Bankruptcy Case from and after the Effective Date.

     **2.    Exculpation and Limitation of Liability.**  Neither the Debtor, the Committee, nor any of their respective present or former officers, directors, employees, members, advisors, attorneys, or agents will have or incur any liability to any party-in-interest or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the bankruptcy Case, the extension of credit to the Debtor during the bankruptcy Case through the use of cash collateral, efforts to obtain confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence or willful misconduct, and in all respects such parties will be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the bankruptcy Case.

     **3.    General Injunction.**  Except as otherwise expressly provided in the Plan, the Confirmation Order shall provide, among other things, that all parties-in-interest who have held, hold, or may hold Claims are permanently enjoined on and after the Effective Date from: (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim against the Debtor or any successor-in-interest of the Debtor, against property of the Debtor, or against property of any successor-in-interest of the Debtor; (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtor or any successor-in-interest of the Debtor, property of the Debtor, or against property of any successor-in-interest of the Debtor with respect to any such Claim; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or any successor-in-interest of the Debtor, against property of the Debtor, or against property of any successor-in-interest of the Debtor with respect to any such Claim; (d) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtor or any successor-in-interest of the Debtor, against property of the Debtor, or against property of any successor-in-interest of the Debtor, with respect to any such Claim; (e) conducting any form of discovery from the Debtor with respect to any such Claim, or any successor-in-interest of the Debtor; and/or (f) harassing the Debtor or any successor-in-interest of the Debtor.

     **4.    Discharge.**  Confirmation of the Plan shall not act as a discharge of the Debtor from all personal liabilities and claims against it.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA  85016
(602) 445-8000

17

**5.** **Vesting.** As of the Effective Date of the Plan, title to all property of the Debtor and its bankruptcy estate will vest in the Liquidating Trust.

**6.** **Payment of Statutory Fees and Filing of Quarterly Reports.** All fees payable pursuant to 28 U.S.C. § 1980, as determined by the Bankruptcy Court at or in conjunction with the Confirmation Hearing, will be paid on or before the Effective Date and, thereafter, in accordance with applicable bankruptcy law. All quarterly reports of disbursements required to be filed by applicable bankruptcy law will be filed in accordance with applicable bankruptcy law.

## X.
## LIQUIDATION ANALYSIS

As illustrated in Exhibit "6" attached hereto and incorporated herein by reference, the Debtor believes that the distributions under the Plan will meet or exceed the recoveries that Creditors would receive in a Chapter 7 liquidation of the Debtor and its Estate.

## XI.
## INCOME TAX CONSEQUENCES

**THE DEBTOR DOES NOT EXPECT THAT ITS LIQUIDATION UNDER THE PLAN WILL RESULT IN ANY SIGNIFICANT TAX CONSEQUENCES.**

**SUBSTANTIAL UNCERTAINTY EXISTS WITH RESPECT TO OTHER TAX CONSEQUENCES ASSOCIATED WITH THE PLAN TO CREDITORS. HOLDERS OF CLAIMS IN MANY CLASSES ARE UNIMPAIRED, AND HOLDERS OF CLAIMS IN MANY OTHER CLASSES WILL BE PAID IN FULL ON ALL ALLOWED AMOUNTS. NEVERTHELESS, EACH HOLDER OF A CLAIM IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES OF THE PLAN. NO RULINGS HAVE BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN.**

## XII.
## VOTING PROCEDURES AND REQUIREMENTS

**A.** **Parties Entitled to Vote.**

If you hold an Allowed Claim that is "impaired" under the Plan, you are entitled to vote to accept or reject the Plan. Accordingly, to be entitled to vote, your Claim must be "allowed" as set forth in Section 502 of the Bankruptcy Code or temporarily allowed as set forth in Bankruptcy Rule 3018(a). Additionally, Section 1126(f) of the Bankruptcy Code permits you to vote to accept or reject the Plan only if your Claim is "impaired."

**B.** **Procedures for Voting.**

*PHX 327956879v8 10/15/2007*

18

**1. Submission of Ballots.** After this Disclosure Statement has been approved by the Bankruptcy Court, all Creditors whose votes are solicited (as explained above) will be sent (a) a ballot, together with instructions for voting (the "Ballot"); (b) a copy of this Disclosure Statement as approved by the Bankruptcy Court; and (c) a copy of the Plan. You should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot sent with this Disclosure Statement. You should complete your Ballot and return it to:

> GREENBERG TRAURIG, LLP
> Attn: John R. Clemency
> SUITE 700
> 2375 EAST CAMELBACK ROAD
> PHOENIX, ARIZONA 85016
> Telephone: (602) 445-8000

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS LISTED ABOVE BY 5:00 P.M., MOUNTAIN STANDARD TIME, ON _____ __, 2007. IF YOUR BALLOT IS NOT TIMELY RECEIVED, IT WILL NOT BE COUNTED IN DETERMINING WHETHER THE PLAN HAS BEEN ACCEPTED OR REJECTED.**

A properly addressed, stamped return envelope will be included with your Ballot.

**2. Procedures for Vote Tabulation.** In determining whether the Plan has been accepted or rejected, Ballots will be tabulated in accordance with the Court's _____.

**3. Withdrawal of Ballots.** A Ballot may not be withdrawn or changed after it is cast unless the Bankruptcy Court permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit the change.

**4. Questions and Lost or Damaged Ballots.** If you have any questions concerning voting procedures, if your Ballot is damaged or lost, or if you believe you should have received a Ballot but did not receive one, you may contact John Clemency at the address and telephone number listed above.

**C. Summary of Voting Requirements.**

In order for the Plan to be confirmed, the Plan must be accepted by at least one (1) impaired Class of Claims. For a Class of Claims to accept the Plan, votes representing at least two-thirds in claim amount and a majority in number of the Claims voted in that Class (not including votes of insiders) must be cast to accept the Plan.

*PHX 327956879v8 10/15/2007*

**IT IS IMPORTANT THAT HOLDERS OF ALLOWED IMPAIRED CLAIMS EXERCISE THEIR RIGHTS TO VOTE TO ACCEPT OR REJECT THE PLAN. THE DEBTOR ASSERTS THAT THE TREATMENT OF CREDITORS UNDER THE PLAN IS THE BEST ALTERNATIVE FOR CREDITORS, AND THE DEBTOR RECOMMENDS THAT THE HOLDERS OF ALLOWED CLAIMS VOTE IN FAVOR OF THE PLAN.**

The specific treatment of each Class under the Plan is described in the Plan and is summarized in this Disclosure Statement.

## XIII.
## CONFIRMATION OF THE PLAN

**A.** **Confirmation Hearing.**

Section 1128(a) of the Bankruptcy Code provides that the Bankruptcy Court, after notice, will hold a Confirmation Hearing on the Plan. The Confirmation Hearing will be held at the United States Bankruptcy Court in _____, _____, Tucson, Arizona, on _____ ___, 2007, at ___:___ p/a.m. **THE HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT MADE AT THE HEARING.**

**B.** **Objections to Confirmation.**

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan, regardless of whether it is entitled to vote. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. **IF AN OBJECTION TO CONFIRMATION IS NOT TIMELY MADE, THE COURT NEED NOT RECEIVE AND CONSIDER IT.** All objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtor's counsel at the address set forth herein above, on the United States Trustee, and on any party-in-interest who has requested notice in the Debtor's Bankruptcy Case, by _____ ___, 2007.

**C.** **Requirements for Confirmation of the Plan.**

**1.** **Confirmation Under Section 1129(a) of the Bankruptcy Code.** At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. Such requirements include, among others:

(a) That the Debtor has complied with the applicable provisions of Chapter 11, including the provisions of Sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and interests and contents of a plan of reorganization.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

(b)     That the Debtor has proposed the Plan in good faith and not by any means forbidden by law.

(c)     That any payment made or promised by the Debtor to any Person for services, costs, or expenses in connection with the Bankruptcy Case or the Plan has been approved by or is subject to approval by the Bankruptcy Court as reasonable.

(d)     That the Debtor has disclosed the identity and affiliations of Persons proposed to serve as officers after confirmation.

(e)     That one or more of the impaired Classes of Claims has voted to accept the Plan.

(f)     That the Plan is in the best interests of holders of Claims and Equity Interests; that is, each holder of an Allowed Claim or Allowed Equity Interest either has accepted the Plan or will receive on account of its Claim or Equity Interest property with a value, as of the Effective Date, that is not less than the amount that the holder of such Claim or Equity Interest would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

(g)     That the Plan is feasible; that is, confirmation is not likely to be followed by the need for liquidation or further reorganization of the Debtor unless that is provided for in the Plan.  The Debtor's Plan so provides; thus, feasibility as described herein is not an issue.

2.     **Debtor Believes the Plan Satisfies Bankruptcy Code Requirements.**

(a)     **Best Interests Test and Liquidation Analysis.**  Under the best interests test, the Plan is confirmable if, with respect to each impaired Class of Claims or Equity Interests, each holder of an Allowed Claim or Allowed Equity Interest in such Class either:  (i) has accepted the Plan; or (ii) will receive or retain under the Plan, on account of its Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

As set forth above, the Debtor believes the distributions to Creditors under the Plan will meet or exceed the recoveries that Creditors would receive in a Chapter 7 liquidation of the Debtors and their Estates.  The Debtor believes that the Plan provides an equal or better return to Creditors than they can otherwise receive under Chapter 7, and therefore the best interests of creditors test is met.

(b)     **Feasibility of the Plan.**  Section 1129(a)(11) of the Bankruptcy Code includes what is commonly described as the "feasibility" standard.  In order for the Plan to be confirmed, the Bankruptcy Court also must determine that the Plan is feasible – that is, that the need for further reorganization or a subsequent liquidation of the Debtors is not likely to result following confirmation of the Plan.  As set forth herein and in the Plan, the Debtor believes the Plan is feasible.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA   85016
(602) 445-8000

21

**(c)** **Acceptance by an Impaired Class.** Because the Plan impairs some Classes of Claims, Section 1129(a)(10) of the Bankruptcy Code requires that, for the Plan to be confirmed, at least one impaired Class must accept the Plan by the requisite vote without counting the votes of any "insiders" (as that term is defined in Section 101(31) of the Bankruptcy Code) contained in that Class. The Debtor believes that at least one impaired Class will vote to accept the Plan.

**(d)** **Confirmation Under Section 1129(b) of the Bankruptcy Code.** Although Section 1129(a)(8) of the Bankruptcy Code requires that the Plan be accepted by each Class that is impaired by the Plan, Section 1129(b) of the Bankruptcy Code provides that the Bankruptcy Court may still confirm the Plan at the request of the Debtor if all requirements of Section 1129(a) of the Bankruptcy Code are met except for Section 1129(a)(8) and if, with respect to each Class of Claims or Equity Interests that (a) is impaired under the Plan, and (b) has not voted to accept the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." This provision commonly is referred to as a "cramdown." The Debtor has requested cramdown confirmation of the Plan with respect to any such non-accepting Class of Creditors as well as the deemed rejecting Class of Equity Interests, who will receive nothing. **The Debtor believes that, with respect to such Class or Classes, the Plan meets the requirements of Section 1129(b) of the Bankruptcy Code.**

**(1)** **Unfair Discrimination.** A plan of reorganization "does not discriminate unfairly" if: (i) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are related to those of the non-accepting class; and (ii) no class receives payments in excess of that which it is legally entitled to receive on account of its Claims or Equity Interests. The Debtors assert that under the Plan: (i) all classes of impaired Claims are being treated in a manner that is consistent with the treatment of other similar classes of Claims; and (ii) no Class of Claims will receive payments or property with an aggregate value greater than the sum of the Allowed Claims in the Class. Accordingly, the Debtor believes that the Plan does not discriminate unfairly as to any impaired Class of Claims or Equity Interests.

**(2)** **Fair and Equitable Test.** The Bankruptcy Code establishes different "fair and equitable" tests for Secured Creditors, Unsecured Creditors, and holders of Equity Interests, as follows:

**(i)** **Secured Creditors.** With respect to a secured claim, "fair and equitable" means that a plan provides that either (A) the holder of the secured claim in an impaired class retains the liens securing such claim, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the amount of such allowed claim, and that the holder of such claim receives on account of such claim deferred cash payments totaling at least the

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

22

amount of such allowed claim, of a value, as of the effective date, of at least the value of such holder's interest in the estate's interest in such property; (B) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claim, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clauses (A) and (C); or (C) the realization by such holder of the "indubitable equivalent" of such claim.

(ii) **<u>Unsecured Creditors.</u>** With respect to an unsecured claim, "fair and equitable" means that a plan provides that either (A) each impaired unsecured creditor receives or retains property of a value, as of the effective date, equal to the amount of its allowed claim; or (B) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(iii) **<u>Equity Interest Holders.</u>** With respect to holders of equity interests, "fair and equitable" means that a plan provides that either (A) each holder will receive or retain under the plan property of a value, as of the effective date, equal to the greater of: (1) the fixed liquidation preference or redemption price, if any, of such interest; or (2) the value of such interest; or (B) the holders of equity interests that are junior to the non-accepting class will not receive any property under the plan.

The Debtor believes the Plan complies with the Claims priority established by the Bankruptcy Code and thus the "fair and equitable" test of the Bankruptcy Code (including the absolute priority rule) is met with respect to the Secured Creditors and the Equity Interest holders under the Plan.

## XIV.
## <u>ALTERNATIVES TO THE PLAN</u>

If the Plan is not confirmed, several different events could occur: (1) the Debtor and/or a third party could propose another plan providing for different treatment of certain Creditors; (2) Secured Creditors, if any, could move for relief from the automatic stay to allow them to foreclose their liens against their collateral, which may be granted by the Court if an alternative plan is not confirmed in a reasonable period of time; (3) the Bankruptcy Court (after appropriate notice and hearing) could dismiss the Bankruptcy Case or convert such to a case under Chapter 7 if an alternative plan is not confirmed in a reasonable period of time; and/or (4) the Bankruptcy Court could approve, in all events, a sale of the Debtor's remaining assets to the highest and best bidder an auction sale under Section 363 of the Bankruptcy Code.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

23

# XV.
## RECOMMENDATION AND CONCLUSION

The Debtor believes that the Plan provides the best available alternative for maximizing the recoveries that Creditors will receive from the Debtor's Assets. Therefore, the Debtor recommends that all Creditors that are entitled to vote on the Plan vote to accept the Plan.

Date:   October 15, 2007

By:   _____
      Gurpreet S. Jaggi
      President and CEO

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

PHX 327956879v8 10/15/2007

24

PREPARED AND SUBMITTED BY:

John R. Clemency (SBN 009646)
Todd A. Burgess (SBN 019013)
GREENBERG TRAURIG, LLP
2375 East Camelback Road
Phoenix, AZ 85016
Telephone: (602) 445-8000
Fax: (602) 445-8100

James P.S. Leshaw (Fla. Bar #917745)
Daniel L. Gold (Fla. Bar #0761281)
GREENBERG TRAURIG, P.A.
1221 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
Attorneys for
First Magnus Financial Corporation

COPIES of the foregoing was sent
via e-mail, facsimile and/or U.S. Mail
on this 15th day of October, 2007 to the
parties attached to the Court's Copy only.


   /s/ Dana N. Troy

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

25

Stephanie L. Cooper
Michael W. Chen
The Cooper Castle Law Firm
820 South Valley View Blvd
Las Vegas, NV 89107
**fax: 702-435-4181**

Linda Boyle
Time Warner Telecom
10475 Park Meadows Drive
Littleton, CO 80124
Attn: Legal Department
**303-566-1010**

First Magnus Lender Services
c/o Jeff Arnold
5255 E. Williams Cir, Ste 2020
Tucson, AZ 85711
**520-917-5296**

John Schlotter
McCalla Raymer, LLC
1544 Old Alabama Road
Roswell, GA 30076
**770-643-4176 Fax**
Authorized Agent for Countrywide Home Loans, Inc.

John D. Schlotter
McCalla Raymer, LLC
1544 Old Alabama Road
Roswell, GA 30076
**Fax 770-643-4176**

Paul Caruso
Sidley Austin, LLP
1 South Dearborn
Chicago, IL 60603
**Fax: 312-853-7036**

Andrew Denatale
Scott Greissman
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
adenatale@whitecase.com
sgreissman@whitecase.com

Kenton Hambrick
8200 Jones Branch Drive, MS 202
McLean, VA 22102
**Fax: 703-903-3691**
Attorneys for Federal Home Loan Mortgage Corp.

Buckley Kolar LLP
c/o Lisa Davila
1250 24th St NW, Suite 700
Washington, DC 20037
**202-349-8080**

Kirkland & Ellis
c/o Gracie Ruiz
777 South Figueroa Street
Los Angeles, CA 90017
**213-680-8500**

R. Frederick Linfesty
Iron Mountain Information Management, Inc.
745 Atlantic Avenue
Boston, MA 02111
**617-451-0409 Fax**

Ronald K. Brown
Law Offices of Ronald K. Brown, Jr.
901 Dove Street, Suite 120
Newport Beach, CA 92660
**Fax: 949-250-3387**
Attorneys for TA Realty

Renee Sandler Shamblin
Office of U.S. Trustee
230 N. First Avenue, Suite 204
Phoenix, AZ 85003
Renee.S.Shamblin@usdoj.gov

Marty Sosland
Weil Gotshal & Manges
200 Crescent Court, Suite 300
Dallas, TX 75201
martin.sosland@weil.com

HX 327941307v1

Michael McGrath
Lowell Rothschild
Mesch Clark & Rothschild PC
259 N. Meyer
Tucson, AZ 85701
mmcgrath@mcrazlaw.com
lrothschild@mcrazlaw.com

Philip R. Rudd
Kutak Rock LLP
8601 N. Scottsdale Road, Suite 300
Scottsdale, AZ 85253
philip.rudd@kutakrock.com

Terri Roberts
German Yusufov,
32 North Stone Avenue, Suite 2100
Tucson, AZ 8570
terri.roberts@pcao.pima.gov
german.yusufov@pcao.pima.gov
Attorneys for Creditor Pima County, AZ

Richard D. Holper
THE HOLPER LAW GROUP PLLC
16853 E. Palisades Blvd., Suite 201
Fountain Hills, AZ 85268
rdh@lshlegal.com

Robert J. Miller
Bryce A. Suzuki
Bryan Cave LLP
Two North Central Avenue, Suite 2200
Phoenix, AZ 85004
rjmiller@bryancave.com
bryce.suzuki@bryancave.com

Clifford B. Altfeld
Altfeld Battaile & Goldman PC
250 N. Meyer Avenue
Tucson, AZ 85701
cbaltfeld@abgattorneys.com
Attorneys for Pyro Brand Development, LLC and The Richards
Group

Timothy H. Barnes
Brier, Irish, Hubbard & Erhart, PLC
2400 E. Arizona Biltmore Circle, Site 1300
Phoenix, AZ 85016
tbarnes@bihlaw.com
Attorneys for United Insurance Company of America

Steve Cox
Waterfall Economidis Caldwell Hanshaw & Villamana PC
5210 E. Williams Circle
Tucson, AZ 85711
Steven.Cox@azbar.org

Samir Parikh
Latham & Watkins
633 W. Fifth Street, Suite 4000
Los Angeles, CA 90071
samir.parikh@lw.com
Attorneys for WNS North America Inc.

Christopher H. Bayley
SNELL & WILMER LLP
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004
cbayley@swlaw.com
Attorneys for Creditor First Magnus Capital, Inc.

Ronald E. Reinsel
Trevor W. Swett
Caplin & Drysdale
One Thomas Circle NW
Washington, DC 20005
rer@capdale.com; tws@capdale.com
Attorneys for UBS Real Estate Securities, Inc.

Jamie R. Welton
Lackey Hershman
3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219
jrw@lhlaw.net
Attorneys for Pyro Brand Development, LLC and The Richards
Group

Russell C. Brannen, Jr.
O'Neil Cannon Hollman Dejong SC
111 E. Wisconsin Ave, Suite 1400
Milwaukee, WI 53202
russ.brannen@wilaw.com
Attorneys for Paul V. Diamond

Matthew R.K. Waterman
Snell & Wilmer LLP
One South Church Avenue, Suite 1500
Tucson, AZ 85701
mrwaterman@swlaw.com
Attorneys for National Bank of Arizona

Craig Raby
1275 West Washington
Phoenix, AZ 85007
Craig.Raby@azag.gov
Attorneys for Arizona Department of Financial Institutions

Nancy March
DeConcini McDonald Yetwin & Lacy PC
2525 E. Broadway Blvd., Suite 200
Tucson, AZ 85716
nmarch@dmyl.com
Attorneys for WNS North America, Inc.

Robert J. Rosenberg
Michael J. Riela
Latham & Watkins LLP
53rd at Third, Suite 1000
885 Third Avenue
New York, NY 10022
robert.rosenberg@lw.com
michael.riela@lw.com

Katrina Rumph
Ikon Office Solutions
Recovery & Bankruptcy Group
3920 Arkwright Road, Suite 400
Macon, GA 31210
krumph@ikon.com

Jeremy T. Bergstrom
Miles, Bauer, Bergstrom & Winters LLP
2200 Paseo Verde Pkwy., Suite 250
Henderson, NV 89052
jbergstrom@mileslegal.com
Attorneys for Countrywide Home Loans, Inc.

Michael R. Pfeifer
Libby Wong
Pfeifer & Reynolds, LLP
765 The City Drive, Suite 380
Orange, CA 92868
mpfeifer@pfeiferlaw.com
lwong@pfeiferlaw.com
Attorneys for Lighthouse Real Estate Solutions

Sean O'Brien
Gust Rosenfeld PLC
201 E. Washington Street, Suite 800
Phoenix, AZ 85004
spobrien@gustlaw.com
Attorneys for Official Committee of Unsecured Creditors

Robert E. Michael
Robert E. Michael & Associates PLLC
950 Third Avenue, Suite 2500
New York, NY 10022
robert.e.michael.esq@gmail
Attorneys for WNS North America, Inc.

Charles J. Filardi, Jr.
Filardi Law Offices LLC
65 Trumbull Street, 2nd Floor
New Haven, CT 06510
charles@filardi-law.com
Attorneys for Federal Express Corporation

Scott D. Gibson
Kristen M. Green
Gibson, Nakamura & Green, PLLC
2941 N. Swan Road, Suite 101
Tucson, AZ 85712
sgibson@gnglaw.com
kgreen@gnglaw.com
Attorneys for Allegra Print & Imaging

Michael D. Warner, Managing Partner
WARNER STEVENS, L.L.P.
301 Commerce Street, Suite 1700
Fort Worth, TX 76102
mwarner@warnerstevens.com
robaldo@warnerstevens.com
Attorneys for Official Committee of Unsecured Creditors

David E. McAllister
Pite Duncan, LLP
525 E. Main Street
El Cajon, CA 92022
dmcallister@piteduncan.com
Attorneys for Chevy Chase Bank, FSB

James E. Cross
Brenda Martin
Jason J. Romero
Osborn Maledon, PA
2929 N. Central Avenue, Suite 2100
Phoenix, AZ 85012
jcross@omlaw.com; bmartin@omlaw.com;jromero@omlaw.con
Proposed Special Counsel for the Debtor

Lance N. Jurich
Vadim Rubinstein
Loeb & Loeb
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
ljurich@loeb.com
vrubinstein@loeb.com
Attorneys for Merrill Lynch

Daniel P. Colllins
Collins, May, Potenza, Baran & Gillespie, PC
2210 Chase Tower
201 North Central Suite 2210
Phoenix, AZ 85073
dcollins@cmpbglaw.com

Rob Charles
Susan Freeman
Lewis & Roca LLP
40 N. Central Avenue
Phoenix, AZ 85004
RCharles@LRLaw.com - SFreeman@LRLaw.com
Attorneys for Buyers under the Mortgages Loan Repurchase
Agreement

Stanford E. Lerch, Esq.
Lerch & Deprima, PLC
4000 North Scottsdale Rd, Suti 107
Scottsdale, AZ 85251
slerch@ldlawaz.com
Attorneys for Anna Tran

Robert P. Harris
Kasey C. Nye, Brian Sirower
Quarles & Brady LLP
One South Church Avenue, Suite 1700
Tucson, AZ 85701
rharris@quarles.com
knye@quarles.com, bsirower@quarles.com
Attorneys for UBS Real Estate Securities, Inc.

Hilary B. Bonial
Brice, Vander Linden & Wernick PC
9441 LBJ Freeway, Suite 350
Dallas, TX 75243
notice@bkcylaw.com
Attorneys for CitiMortgage, Inc.

Jeffrey Wisler
Chirstina Thompson
Connolly Bove Lodge & Hutz LLP
The Nemours Bldg, 1007 N. Orange Street
Wilmington, DE 19899
jwisler@cblh.com
cthompson@cblh.com
Attorneys for Stoltz Management of Delaware, Inc.

Eric Slocum Sparks
Law Office of Eric Slocum Sparks
110 South Chruch Avenue #2270
Tucson, AZ 85701
eric@ericslocumsparkspc.com
Attorneys for Ronald J. Gapp, Giuseppe Fusco, and Herbert
Eugene Lewis

Scott K. Rutsky
Adam T. Berkowitz
Proskauer Rose, LLP
1585 Broadway
New York, NY 10036-8299
srutsky@proskauer.com
aberkowitz@proskauer.com

David Engelman
Steven Berger
Bradley Pack
Engelman Berger, PC
3636 N. Central Avenue, Suite 700
Phoenix, AZ 85012  dwe@engelmanberger.com,
snb@engelmanberger.com,bdp@engelmanberger.com
Attorneys for Wells Fargo Bank

John T. Siegler
ASK Financial LLP
2600 Eagan Woods Drive
Eagan, NM 55121
Attorneys for Americom Inc.
JSiegler@askfinancial.com

Shelton L. Freeman
DeConcini McDonald Yetwin & Lacy, PC
7310 N. Sixteenth Street, Suite 330
Phoenix, AZ 85020
tfreeman@dmylphx.com
Attorneys for Joseph's Appraisal Group AZ, Inc.

Walter H. Gilbert
Ryan J. Bird
Almquist & Gilbert, PC
10245 E. Via Linda, Suite 106
Scottsdale, AZ 85258
wgilbert@almquist.com
rbird@almquist.com

Mark Bosco
Leonard McDonald
Tiffany & Bosco
2525 E. Camelback Rd, Suite 300
Phoenix, AZ 85016
msb@tblaw.com
ljm@tblaw.com
Attorneys for Countrywide Home Loans, Inc.

John Fries
Ryley Carlock & Applewhite
One North Central Avenue, Suite 1200
Phoenix, AZ 85004
jfries@rcalaw.com
Attorneys for Time Warner Telecom of Arizona, LLC

HX 327941307v1

James B. Ball
Poli & Ball PLC
2999 North 44th Street, Suite 500
Phoenix, AZ 85018
ball@poliball.com
Attorneys for Bank of America, NA

Robert Hacket
Gregory Falls
Mohr, Hackett, Pederson, Blakley, et al
2800 N. Central Ave., Suite 1100
Phoenix, AZ 85004
rhackett@mhplaw.com
gfalls@mhplaw
Attorneys for J. McInery, M. Sukenik, B. & R. Swan, R. Walcher, J.
Burkley, K. Swan, S. West and R & S White

John K. McAndrew
Woods Oviatt Gilman LLP
700 Crossroads Building
2 State Street
Rochester, NY 14614
jmcandrew@woodsoviatt.com
Attorneys for Function5 Technology Group

Lance N. Jurich
Loeb & Loeb, LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
ljurich@loeb.com
Attorneys for Merrill Lynch Bank USA

Ali J. Farhang
Fennemore Craig PC
One South Church Avenue, Suite 1000
Tucson, AZ 85701
afarhang@fclaw.com

Steven N. Berger
Engleman Berger, PC
3636 North Central Avenue, Suite 700
Phoenix, AZ 85012
snb@engelmanberger.com
Attorneys for MCA Financial Group, Ltd.

R. Michael Farquhar
Winstead PC
5400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
mfarquhar@winstead.com
Attorneys for Bank of America, NA

Steven W. Kelly
Silver & DeBoskey
1801 York Street
Denver, CO 80206
skelly@s-d.com
Attorneys for Brookwood Tamarac Plaza Investors, LLC

Carolyn J. Johnsen
Jennings Strouss & Salmon PLC
The Collier Center, 11th Floor
201 East Washington Street
Phoenix, AZ 85004
cjjohnsen@jsslaw.com
Attorneys for Merrill Lynch Bank USA

John Fries
Ryley Carlock & Applewhite
One North Central Avenue, Suite 1200
Phoenix, AZ 85004
jfries@rcalaw.com
Attorneys for Wells Fargo Bank, NA and Wells Fargo Funding,
Inc.

Robert C. Hackett
Gregory Falls
Mohr, Hackett, Pederson, Blakley & Randolph, PC
2800 N. Central Avenue, Suite 1100
Phoenix, AZ 85004
rhackett@mhplaw.com
gfalls@mhplaw.com
Attorneys for Flagstaff Ranch Creditors