**SIGNED.**

**Dated: February 15, 2008**



_____
**JAMES M. MARLAR**
**U.S. Bankruptcy Judge**

_____

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

In re:                      )    Chapter 11

                               )

FIRST MAGNUS FINANCIAL     )    No. 4:07-bk-01578-JMM

CORPORATION,                )

                               )    **MEMORANDUM DECISION**

                 Debtor.         )

On February 7 and 11, 2008, the debtor-in-possession, First Magnus Financial Corporation ( "Debtor"), presented its case for confirmation of its liquidation plan under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 _et seq_. All appearances by interested parties were noted on the record.

In connection with the plan, the court received six written objections. However, by the conclusion of the hearing, most had been resolved either by agreement, or by such party's concerns having been satisfied by the evidence.[1]

## I. THE PLAN

The plan proposed by the Debtor, and supported by the Official Committee of Unsecured Creditors (the "Committee") consists of a short-term continuance of the Debtor's

---

[1]      Objections resolved by stipulation were: Pima County, Maricopa County, certain employees, UBS, Countrywide, and Wells Fargo. Also, most of the objections filed by WC Partners were satisfied by the close of the evidence. The only remaining and substantial objection was filed by WNS North America, Inc. ("WNS"). UBS and Countrywide did not file formal objections, but were engaged in last-minute negotiations leading to their support of the plan and their respective treatment. UBS presented a "term sheet" of its settlement with the Debtor (UBS Ex. 1).

business, operated solely for the purpose of winding-down and disposing of the Debtor's specialized asset portfolio in a businesslike manner. In theory, this type of liquidation is preferable to the usual short-term "fire sale" associated with bankruptcy liquidations. To accomplish a higher return, however, the plan requires an experienced core staff to remain employed, so that their particular expertise can be utilized in a way that hopefully returns more to the creditors than forced asset sales.

The plan replaces the Debtor's current management with an advisory board, consisting of impartial representatives from the unsecured class of creditors. The board's principal duty will be to oversee the operation of two trusts, one designed to most effectively manage and/or sell the Debtor's assets (the "Liquidation Trust"), and the other designed to analyze the numerous legal issues associated with the Debtor's pre-bankruptcy operations, as well as review all claims for payment which have been presented to the reorganized debtor (the "Litigation Trust"). If any member of current management is to remain on the short-term payroll, that person or persons serves at the will of the advisory board.

The managing trustees of both the Liquidation and the Litigation Trusts are disinterested parties, with no pre-petition "insider-type" connection to the Debtor or its officers, directors, or shareholders.

## II.  THE BASIC CONFIRMATION REQUIREMENTS

### A.  The Ballot Report

The Debtor's liquidation plan was circulated to all of the creditors of the Debtor. Each was invited to vote either in favor of, or against the plan. The votes were then tabulated and a report was filed with the court.

Bankruptcy law allows a debtor to "classify" claims based on their legal similarity. 11 U.S.C. § 1122. A class is deemed to have accepted a plan if those voting (without consideration of votes of "insiders") accept in the following way:

1.      Fifty-one percent or more of the class support the plan, <u>and</u>

2.      Those supporting the plan must hold at least 66 2/3% of the dollar amounts of all those voting in the class.

11 U.S.C. § 1126(c).

## B. A Closer Look at Classes 3 (Unsecured Creditors) and 4 (Rejection Damages)

The Debtor's plan divided the creditors into nine classes.  The major unsecured classes were placed into two groups, Class 3 and Class 4.  A small group of unsecured claims was dealt with in Class 8.

Without accounting for the insider claim of First Magnus Capital, Inc.,[2] the votes and percentages of each class were as set forth below:

| | Class | # Accept | # Reject | % Accept | $ Accept | $ % Reject | $ % Accept | Class Vote |
|---|---|---|---|---|---|---|---|---|
| 1 | Priority Non-tax/Wage | 1,186 | 26 | 97.5% | $6,201,924 | $148,347 | 97.3% | Accepted |
| 2 | Secured | 4 | 4 | 50% | 124,353 | 36,895,767 | .003% | Rejected |
| 3 | General Unsecured/ Trade | 318 | 18 | 94.4% | 336,214,329 | 16,805,684 | 95.2% | Accepted |
| 4 | Unsecured/ Rejection Damages | 14 | 4 | 77.8% | 1,225,610 | 3,373,810 | 26.6% | Rejected |
| 5 | WaMu | -- | -- | -- | -- | -- | -- | -- |

[2]    First Magnus Capital, Inc. filed an unsecured claim for $37,482,017.91 (WNS Ex. Q).

3

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 6 | Repo Participants | -- | -- | -- | -- | -- | -- | -- |
| 7 | Subordinated Creditors | -- | -- | -- | -- | -- | -- | -- |
| 8 | Credit Borrowers | 8 | 1 | 88.9% | 35,994 | 400 | 99% | Accepted |
| 9 | Equity | -- | -- | -- | -- | -- | -- | Deemed Rejected |

Ballot Report (Ex. 1, Dkt #1247).

WNS, an objecting creditor, contends that, first, with regard to Classes 3 and 4, they should be counted as a single class. However, as the Debtor pointed out in argument, doing so would still result in an affirmative vote for the plan, as follows:

| **Number Accepting** | **Number Rejecting** | **Number Percentage Accepting** |
|---|---|---|
| 332 | 22 | 93.8% |

| **Dollars Accepting** | **Dollars Rejecting** | **Dollar Percentage Accepting** |
|---|---|---|
| 337,439,939 | 20,179,494 | 94.4% |

Thus, "collapsing" the two classes into a single class results in a vote in favor of the plan.

WNS next contends that the Debtor should not have included the claim of Lehman Brothers, which was filed and counted as an accepting Class 3 vote for $288,093,553. (WNS Ex. T.) Using the same "collapsed" analysis urged by WNS, and putting Classes 3 and 4 together, yet excluding Lehman Brothers' vote, alters the figures but not the result:

| **Number Accepting** | **Number Rejecting** | **Number Percentage Accepting** |
|---|---|---|
| 331 | 22 | 93.8% |

| **Dollars Accepting** | **Dollars Rejecting** | **Dollar Percentage Accepting** |
|---|---|---|
| 49,346,386 | 20,179,494 | 71% |

4

Therefore, even by this measure, the Debtor would have received the required percentages to accept.

Not fully explained by WNS, though, is why Lehman Brothers' claim and vote should not be included as part of the Class 3 voting group. Although all of the witnesses testified that the Lehman Brothers' claim was larger than expected, and that they anticipated that it was in large part speculative and not provable, it has not yet been objected to pursuant to FED. R. BANKR. P. 3007, nor excluded from casting a vote. Thus, Lehman Brothers was entitled to vote on the plan. But even without it, and unifying Classes 3 and 4, still results in a class vote favoring the plan.

The WNS objection to the claims classification process, then, as unwarranted "gerrymandering" or an indication of improper motive or lack of good faith, was rendered moot. This is because, taking any of WNS' "vote" objections in the best light favoring WNS' argument, yields no result other than an acceptance. The unsecured class or classes, viewed in that manner, have still voted to accept the plan.[3]

## III. CONFIRMATION

In order to confirm a contested plan, when all classes have not accepted the plan, a proponent must prove all of the applicable and enumerated standards set forth in 11 U.S.C. § 1129(a), as well as the "cramdown" provisions of § 1129(b). If a plan proponent cannot touch all the bases under § 1129(a), the plan cannot be confirmed and there is no need to test the § 1129(b) factors. However, if the only condition not satisfied is § 1129(a)(8) (unanimous support), then a plan may still may be confirmed if the "cramdown" provisions of § 1129(b) are satisfied. *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir. 1997); *In re Arnold and Baker Farms*, 177 B.R. 648, 658-59 (9th Cir. BAP 1994), *aff'd*, 85 F.3d 1415 (9th Cir. 1996); *In re M. Long Arabians*, 103 B.R. 211, 217-18 (9th Cir. BAP 1989); 11 U.S.C. § 1129(a) (providing that "[t]he court shall

---

[3]     Manipulation of votes to gain an impaired consenting class is called "gerrymandering," and is considered a measure of "bad faith" in violation of § 1129(a)(3). *See In re Barakat*, 99 F.3d 1520, 1526 (9th Cir. 1996); *In re Tucson Self-Storage, Inc.,* 166 B.R. 892, 898 (9th Cir. 1994); *see also* 7 *Collier on Bankruptcy* ¶ 1122.03[2] (15th ed. rev. 2006) (claims and interests that are inherently different cannot be placed in the same class).

confirm a plan only if all of the following requirements are met."). Thus, if a plan proponent cannot touch all sixteen bases under § 1129(a), the plan cannot be confirmed and there is no need to test the § 1129(b) cramdown factors.

The court will now address each of the factors, and discuss whether the Debtor can confirm its plan.

## A.  Sections 1129(a)(1) and (2)

## The Plan and Its Proponent Must Comply with the Bankruptcy Code

These provisions are intended to ensure that the Debtor has adequately complied with the Bankruptcy Code. In the instant case, the court finds that the Debtor's efforts have cleared this hurdle. The Debtor's disclosure statement, when finalized, was adequate in the transmittal of relevant information. The Debtor cooperated in filing it promptly, making necessary changes, and circulating it in adequate time to meet court-ordered deadlines. *See* 11 U.S.C. § 1125.

The plan was straightforward, adequately addressed how the anticipated liquidation would proceed; what results were expected when measured against a chapter 7 trustee-imposed regime; and provided a vehicle through which legal courses of action or challenges could be expeditiously handled. Prior management is to be ousted, and replaced by a creditors' advisory board, which in turn is to be delegated reporting powers, general oversight, and supervisory responsibilities over both the ongoing liquidation and legal issues.

That the creditors voted favorably for this arrangement and plan likewise shows that creditors understand the plan, which translates into a trend toward overall compliance with the Bankruptcy Code.

The Debtor proved compliance with 11 U.S.C. §§ 1129(a)(1) and (2).

## B. Section 1129(a)(3) - Good Faith

A bankruptcy court shall confirm a plan "if the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "The good faith that is required to confirm a plan requires the plan to achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *Arnold and Baker Farms*, 177 B.R at 658; *see also In re Sylmar Plaza, L.P.*, 314 F.3d 1070 1074 (9th Cir. 2002). The good-faith determination is based on the totality of the circumstances. *Id.*

From filing forward, the case has progressed smoothly, efficiently, and on a fast pace. There has been little legal skirmishing, and the Committee has kept a watchful eye on the Debtor's operations. So far as the court can discern, cooperation between the Debtor, the U.S. Trustee's Office, most of the major creditors, and the Committee has been without incident.

Under all of the circumstances, this court concludes that the Debtor has met the good faith prong of 11 U.S.C. § 1129(a)(3).

## C. Section1129(a)(4) - Payments to Professionals and Others

Section 1129(a)(4) requires that professional fees for those working on a debtor's case be submitted to the court, and approved as reasonable before being authorized for payment. The Debtor's plan so provides, and all fees approved to date have been allowed as interim, not final. Future requests for similar efforts, through the plan's effective date, will likewise be submitted to the court for approval.

Once a plan is confirmed, its terms become a new contract affecting a former debtor's creditors, and it may emerge from the bankruptcy court's shadow without the same degree of judicial scrutiny over its future operations. Generally, a bankruptcy court loses jurisdiction over the case, except for those parts for which its power is specifically retained. *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 589 (9th Cir. 1993). The reorganized entities are therefore free to employ attorneys and other professional persons without obtaining authority from the bankruptcy

court to do so.  *See* 11 U.S.C. §§ 327(a), 1107(a) (only the chapter 11 debtor in possession and trustee require court approval to employ professional persons).  The court's scrutiny over fees ends when the plan becomes effective and the reorganized debtor exits court with a confirmed plan.

Thus, this section of the Code was satisfied.

### D.  Section 1129(a)(5) - Future Officers of the Debtor

The Code requires that those who are proposing to serve, post-confirmation, be disclosed and that their retention be consistent with the interests of creditors and equity security holders and with public policy.  The Debtor's plan and evidence satisfied both prongs.

The Debtor's current principals are to be removed, and under the plan, Class 9 equity holders will receive no distribution under the plan.  The compensation to be paid to those providing oversight and services to the reorganized Debtor is disclosed in the plan, and the intended method for compensation was testified to by, among others, the disinterested trustees, Morris Aaron and Thomas Lattig.

Accordingly, the court finds that the Debtor proved this required element under § 1129(a)(5).

### E.  Section 1129(a)(6) - Regulatory Bodies

Bankruptcy Code §1129(a)(6) is not applicable to this Debtor in the way that the statute is intended to operate.  To be sure, there are certain licensing or regulatory agencies involved peripherally in the Debtor's operations, but such agencies are not charged with rate-making or other such powers.  Obviously, to compete in the specialized markets in which the Debtor operates, the Debtor is required to abide by all of that market's rules, but this Code section is not generally applicable to those types of regulations.

8

Accordingly, the court finds that 11 U.S.C. § 1129(a)(6) is not applicable. To the extent that it may be in some minor fashion, the Debtor has complied sufficiently with the Bankruptcy Code.

**F. Section 1129(a)(7) - Best Interests of Creditors**

This section of the Bankruptcy Code requires that creditors realize at least as much under the plan as they would in a liquidation. Since the Debtor's plan is <u>only</u> a liquidation plan, and provides for no ongoing business once it assets are liquidated, this Code section achieves its intended result. *See* Debtor's Ex. C.

The only question, raised by WNS, is whether the creditors would realize more under the auspices of a chapter 7 trustee than the plan's scheme for a two-trust, advisory board system. The Debtor's witnesses testified that, if managed properly with existing, limited personnel, the company's assets can be more effectively managed and sold than if the entire estate were given over to a new person, a chapter 7 trustee. In that event, a chapter 7 trustee would arrive fresh to the case, would not have the ongoing loyalty and goodwill that MCA Financial (the proposed liquidating trustee's company) has, and may not have the financial expertise to deal with the immediate needs of the company. Moreover, there is no doubt that there would be a steep learning curve involved in educating a chapter 7 trustee to the existing operation and its unique legal and business challenges. In addition, there is no guarantee that a chapter 7 trustee would elect to continue present operations, with its payroll and tax responsibilities, withholding, insurance, rent, and other such day-to-day requirements. A trustee might simply shut the doors and quickly "fire-sale" the assets. The end result for creditors would likely be less than if the Debtor continued on the current path to an orderly and complete liquidation.

Presently, the company has retained key employees, and continues to gather and organize assets and seek markets. It is also renegotiating with note payors in efforts to stave off foreclosures and transform non-productive or troubled assets into productive ones. These benefits

9

are substantial.  There was no evidence presented that a chapter 7 trustee, if appointed, would fare better.

On the totality of the evidence, then, the court finds that the creditors will be at least as well off under the plan as they would be in a chapter 7, and therefore finds that the Debtor has satisfied the 11 U.S.C. § 1129(a)(7) element.

### G.  Sections 1129(a)(8) and (10) - Acceptances or Unimpairment;
### Acceptance By at Least One Impaired Consenting Class

All impaired classes did not accept the Debtor's plan, thus requiring a "cramdown" approach to confirmation.  11 U.S.C. §§ 1129(a)(8) and (10); § 1129(b)(1).  The Debtor proved, to the extent applicable in a "cramdown" case, compliance with §§ 1129(a)(8) and (10).  Since the Debtor has achieved the affirmative vote, in favor of its plan, of at least one impaired class of creditors, these elements are satisfied.  The Debtor has received affirmative votes from Classes 1, 3, and 8.  If the votes of Classes 3 and 4 are combined into a single class, then the Debtor has received the affirmative vote of three out of eight classes.  Classes 5, 6, and 7 did not vote at all, and Class 9 (equity) is deemed to have rejected.  Class 2 (secured creditors) and Class 4 (rejection creditors) voted to reject.  Three of the nine classes voted to accept (Classes 1, 3, and 8).

The case must therefore proceed to the "cramdown" issues, found in 11 U.S.C. § 1129(b), in order to determine if each dissenting class is being treated fairly and equitably under the plan.  These issues are discussed below, pp.12-15.

However, §§ 1129(a)(8) and (10) are satisfied.

### H.  Section 1129(a)(9) - Priority Claims Payment

The plan complies with this section, and the Class 1 creditors voted to accept their impaired treatment.  The Debtor satisfied this statutory requirement.

Case 4:07-bk-01578-EWH    Doc 1447    Filed 02/15/08    Entered 02/15/08 16:17:06    Desc
Main Document    Page 10 of 22

**I.  Section 1129(a)(11) - Future Liquidation Improbable**

Since the plan is a liquidation one, § 1129(a)(11) is not applicable.  No competing plans were filed.  There is no need to test the plan against the potential for future liquidation because liquidation <u>is</u> the plan.  Thus, the Debtor has satisfied this Code provision.

**J.  Section 1129(a)(12) - Fees**

The Debtor has filed monthly operating reports which show it has paid the fees due to the U.S. Trustee.  The U.S. Trustee did not appear, file an objection, or contend otherwise. Moreover, the plan proposes to pay all such unpaid fees, if any, at or before the plan's effective date. Section 1129(a)(12) has been satisfied.

**K.  Section 1129(a)(13) - Retiree Benefits**

This section of the Code, § 1129(a)(13), is not applicable.  It deals with retiree benefits, and this Debtor has no such group of former employees who are receiving pensions.

**L.  Sections 1129(a)(14) - (16) - Domestic Support Obligations;**
**Individual Chapter 11; Transfers**

These provisions do not appear to apply, but if § 1129(a)(16) does apply to future property transfers, the Debtor has complied therewith.

## M. **Conclusion as to Section 1129(a) Factors**

The Debtor has met the burden of proof relative to each of the 11 U.S.C. § 1129(a) subsections, with the exception of § 1129(a)(8). Thus, the court must proceed to analyze the "cramdown" provisions of § 1129(b).

## IV. **"CRAMDOWN" - SECTION 1129(b)**

Now, the court must decide whether the plan is fair to the dissenting classes which have either voted against, or failed to vote, on the Debtor's plan. Section 1129(b) of the Code is sometimes called the "cramdown" section, because if a plan is confirmed, it becomes effective as against all creditor classes, even those which have voted against it. 11 U.S.C. § 1141(a). However, in order to cram down a plan on unwilling classes, the plan must treat each rejecting class in a statutory manner which is "fair and equitable." 11 U.S.C. § 1129(b)(1).

The concept of "unfair discrimination" applies to whether a plan properly treats claims or interests differentially. *See In re Acequia, Inc.,* 787 F.2d at 1364 & n.18; 7 *Collier on Bankruptcy* ¶ 1129.04[3] (15th ed. rev. 2007) ("There can be 'discrimination,' so long as it is not 'unfair.'"). WNS objected on this issue on the grounds that the plan separately classifies unsecured claims, and gives disparate treatment to disputed claims. The court has herein determined that this liquidation plan meets the best interests of creditors' test, that the classification scheme provides the same treatment for Class 3 and Class 4 and did not change the outcome of the vote which was overwhelmingly in favor of the plan. In regards to the treatment of disputed claims, Debtor agreed to amend the definition to provide that only the disputed portion of a claim shall be denied any distribution, under any class in which it falls, unless and until it is allowed, and has assured the court and interested parties that the Liquidating Trustee will maintain an appropriate reserve for payment of such claims once allowed. *See* Plan § 1.34; § 10.2. Furthermore, WNS' specific objections are discussed below and rejected in regards to this issue. Therefore, the court concludes that the plan does not discriminate unfairly as to any dissenting or nonvoting impaired class.

12

"Fair and equitable" is a defined term under § 1129(b)(2) of the Code, and will be analyzed in accordance with the treatment of the impaired classes.

### A. **Class Two - The Secured Creditors**

Section 1129(b)(2) generally requires that, for a class of secured creditors to be treated fairly and equitably, they must retain their liens, be paid the value of the security (even if sold), and always be paid at least the value of their collateral, even if paid over time.

The plan, at Article V, Sec. 5.1 at 17, provides for exactly this type of treatment. The plan thus treats this class of creditors fairly and equitably.

The plan may be confirmed over the vote of the rejecting Class 2 secured creditors.

### B. **Class Five - Washington Mutual ("WaMu")**

WaMu holds, for bankruptcy "cramdown" purposes, either a "secured" claim or an "interest." While neither of these definitions may fit WaMu specifically, the terms at least enable the court to exercise its "cramdown" powers over whatever kind of unique interest WaMu holds. §§ 1129(b)(2)(A) and (c).

The court's job, in this regard, is made infinitely easier because WaMu neither filed a vote in favor of or against the plan, nor did WaMu object to the plan. WaMu has also settled all or most of its issues with the Debtor. Thus, for all intents and purposes, WaMu's neutrality in regard to the plan is an indication that it is generally accepting of its treatment under the plan.

A look at its treatment renders the reason. WaMu is essentially left in control of its "collateral," paying the Debtor $3,150,000 therefor, while at the same time waiving any future claims against the Debtor. WaMu is now sidelined, and appears comfortable that its ox is not being gored by the plan.

Therefore, as WaMu appears satisfied with this treatment, the court may find that this Class 5 creditor is being treated fairly and equitably for cramdown purposes.

## C.  Class Six - Repo Participants

This group also failed to vote either way, and did not file an objection to the plan.  The discussion relative to WaMu above also applies generally to this class.

The court therefore finds this class has also been treated fairly and equitably, and finds that any confirmed plan will bind such class of creditors.

## D.  Class Seven - Subordinated Claims

To date, no creditors' claims have been subordinated.  In the future, if such creditors are found to exist, their treatment under the plan is consistent with § 510 of the Bankruptcy Code, and as to such potential future unsecured creditors, this class will receive a distribution, if any, only ahead of those parties, creditors, or groups which have a lower statutory priority.  11 U.S.C. § 1129(b)(2)(B)(ii).  Under the plan, the only group which is lower is made up of those persons who hold stock in the Debtor (the "equity").

The Debtor has satisfied the "cramdown" requirements as to the future Class 7 claimants.

## E.  Class Nine - Equity

Under the plan, equity "interests" are subject to the absolute priority rule, which means that they can receive nothing until any senior class (i.e., everyone else) has been paid in full.  11 U.S.C. § 1129(b)(2)(C)(ii).  The plan thus satisfies the cramdown requirements as to the "equity."

## F.  **Conclusion as to "Cramdown"**

As noted, the plan has met the statutory requirements of 11 U.S.C. §§ 1129(a) and (b), and the Debtor has proven each element by a preponderance of the evidence.  This plan can be confirmed, unless objections are sustained.  The court will now address those objections.

## V.  **THE WNS OBJECTIONS AND MOTION TO CONVERT**

### A.  **WNS' PLAN OBJECTIONS**

The only creditor which vigorously contested the Debtor's plan was WNS North America, Inc. ("WNS").  The court's discussion of the confirmation requirements of §§ 1129(a) and (b) above, addressed, either directly or indirectly, many of WNS' objections.  However, the court will nonetheless endeavor to comment and rule upon WNS' concerns.

### 1.  **Plan Governance**

WNS is worried that the plan places too much power in the hands of the three-person advisory board, and that its internal decision-making mechanism limits involvement by other creditors.  While WNS may not appreciate the scheme proposed, it is still abundantly clear that the plan was voted upon as follows:

| | |
|---|---|
| Class 1 | Accept |
| Class 2 | Accept |
| Classes 3 and 4 (combined) | Accept |
| Class 5 | No vote |
| Class 6 | No vote |

15

| Class 7 | No vote |
| Class 8 | Accept |
| Class 9 | Deemed rejected |

Thus, the creditors, as a large group and in vast numbers, have spoken. The governance issues are not Code requirements. If the creditors support the plan, and if the plan otherwise satisfies the Code's provisions, the court will not, nor does it have the statutory power to substitute its judgment on such matters for that of the creditors.

The court, having heard the evidence, perceives no bad faith in the plan's terms. Therefore, WNS' objection on this point will be overruled.[4]

## 2. **Adequate Disclosure**

WNS complains that the disclosure statement contained inadequate information to inform the creditor body of the Debtor's plan, and the details supporting it. The court disagrees. The disclosure statement was vetted, refined by all concerned in a variety of ways, and finally approved. In so doing, any perceived deficiencies were corrected, and the final product captured the essence of the various facets of the Debtor's business and the future blueprint for the maximum recovery of the Debtor's assets.

The court finds now, as it did once before, that the disclosure statement contained adequate information. No evidence was presented, by any party, to show that had the disclosure statement included or excluded particular information, that a creditor would have voted differently. WNS cared for neither the plan nor the disclosure statement, and ultimately voted to reject the plan. Had WNS received additional information, it is doubtful that its vote would have changed. WNS

---

[4] Similarly, WC Partners' sole remaining objection would seem to also fall within the "plan governance" area. WC is worried that the plan functionaries may have limited legal exposure for malfeasance. However, most creditors voted in favor of the plan, and saw no harm in the provision. Not being in violation of a statute, the court does not see a legal basis upon which to deny confirmation. WC's remaining objection will be overruled.

Case 4:07-bk-01578-EWH    Doc 1447    Filed 02/15/08    Entered 02/15/08 16:17:06    Desc
Main Document    Page 16 of 22

1  was given the opportunity to provide further evidence on this point if it wished to do so, but it did

2  not.

3    Thus, left with the same disclosure statement as it previously approved, this court

4  cannot find that such ruling was erroneous, either factually or as a matter of applying incorrect law.

5  Accordingly, this WNS objection will be overruled.

6

7  ### 3. Shielding Insiders

8

9    WNS maintains that the Debtor has consistently attempted to shield the insiders. The

10  court disagrees. The court has not perceived this to be a debtor strategy, and in fact, although the

11  court has openly discussed this issue numerous times, it has never felt that a "cover-up" was being

12  perpetuated by the Debtor.[5] The Committee once explained that its desire was to 'soft-pedal" these

13  issues, as a tactical strategy. However, WNS asked the court for more transparency in the disclosure

14  statement, and the court agreed. The insiders no doubt recognize, by now, that their actions will be

15  the subject of future scrutiny by both the litigation and liquidation trustees. The two trusts are broad

16

17

18

19

20  _____

21    [5]    In fact, the plan ensures that all relevant legal causes of action are preserved for the
    benefit of the estate's creditors:

22
      After the Effective Date, the Liquidating Trustee (with respect to Estate
23    Claims) and the Litigation Trustee (with respect to Estate Tort and Other
      Claims), as duly appointed representatives of the Estate, both shall have the
24    avoiding powers of a statutory trustee appointed under Bankruptcy Code
      section 1106. *See* 11 U.S.C. § 1123(b)(3)(B); *In re Professional Investment*
25    *Properties of America (Briggs v. Kent)*, 955 F.2d 623, 625-26 (9th Cir.
      1992) (holding that a trustee's strong arm powers are transferable); *In re*
26    *P.R.T.C., Inc. (Duckor Spradling & Metzger v. Baum Trust)*, 177 F.3d 774,
      781 (9th Cir. 1999) (""[i]t is a well settled principle that avoidance powers
27    may be assigned to someone other than the debtor or trustee pursuant to a
      plan of reorganization' under 11 U.S.C. § 1123(b)(3)(B)").

28
    Ex. B, Second Amended Disclosure Statement at pp. 32-34.



enough to encompass such investigation, and the two trustees, as well as the members of the advisory board, are cognizant of their express duty to maximize the bankruptcy estate for the benefit of all creditors.[6]

WNS' objection, therefore, on this ground, will be overruled.

## 4. Future Fees

WNS contends that this court will not have jurisdiction to determine the reasonableness of future fees, post-confirmation. This is true, but the plan properly continues that supervision until the last possible legal moment. As noted above, once the effective date is reached, the court's jurisdiction over such issues evaporates. Thus, the plan does not violate § 1129(a)(4).

WNS' objection on this ground will be overruled.

## 5. Objection to Plan Treatment of Other Classes

WNS believes that the treatment of certain other classes, of which it is not a member, is misguided or not supported by statute. WNS' efforts to speak on behalf of Classes 1 and 8, however, may not be advanced, because WNS is a member of neither class, and those classes voted in favor of the plan. In short, WNS has no legal standing to complain that those classes have been treated unfairly.

Similarly, WNS has no standing to argue against the treatment of Classes 5, 6, or 7, since, to date, it belongs in none of them.

WNS' objection on this ground will be overruled.[7]

---

[6]     Although WNS placed the depositions of Thomas Sullivan, Sr. and Thomas Sullivan, Jr. in evidence, their testimony offered factual statements about their relationship with the Debtor, but did not, for now, do much else. *See* WNS Ex. A, U.

[7]     Class 2 rejected the plan, and although WNS is not in this class either, the court found that the plan could be "crammed down" on this class. *See* p. 13 of this Memorandum Decision.

18

## 6. **"Scapegoating" of WNS**

WNS has, throughout this case, been vociferous and effective in taking issue with the Debtor's strategy or progress. In so doing, it has kept the court and other parties focused on meaningful issues. But this court has never gotten the impression that WNS has been unfairly or unprofessionally attacked, nor that the Debtor, the Committee, or any party has raised improper, Rule 11 type arguments. Every issue that was disputed, by any party, was both professionally and civilly pled. Legitimate disputes were argued, briefed, and resolved appropriately. All attorneys have acted in the highest professional manner. But, as we all know, litigation carries a price: not everyone can be satisfied every time. Differing points of view, in an adversarial system of justice, are encouraged, not discouraged. The end result, we all hope, will be a just one. While frustration goes hand in hand with most litigation, this court does not perceive that an unfair, unprofessional, or unethical "dogpile" was effectuated against WNS.

WNS' objection, on this ground, will be overruled.

## 7. **Disputed Claims "Holdback"**

The plan, as currently configured, enables the administrative oversight personnel to dispute claims. Until resolved, those claims will remain unpaid and maintained in a "holdback" status. When finally resolved, the approved portion may be paid. The court does not view this scheme as being inherently radical, unfair, or unusual. Claims objections will be filed quickly, and sorted out by agreement or summary hearings. If necessary, the court may convert some contested matters to adversary proceedings. The plan's proposal for claims resolution and payment is consistent with the custom and practice of most Arizona bankruptcy cases. The process of claims adjudication and payment must be approached cautiously, so that unnecessary mistakes do not lessen the pool of money available for creditor payments.

Many demands are placed upon bankruptcy trustees or like professionals. Their discretion should be conservatively exercised at all times. The court can conceive of no unfairness

or statutory impropriety in the plan's selected method of handling claims resolution and ultimate payment.

Therefore, WNS' objection on this ground will be overruled.

### 8. "Gerrymandering"

Another WNS objection maintains that the Debtor improperly classified the creditor groups in a manner designed to obtain an impaired consenting class. This is a "good faith" objection. § 1129(a)(3). The Ninth Circuit clarified that separate classification of "similar" claims "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." *In re Tucson Self-Storage, Inc.,* 166 B.R. 892, 897 (9th Cir. 1994); *Steelcase v. Johnston (In re Johnston)*, 21 F.3rd 323 (9th Cir. 1994). This argument fails for several reasons.

First, the Debtor had three (3) accepting impaired classes, in Classes 1, 3, and 8. Thus, even without the offending Class 3, which WNS contends should be lumped with the Class 4 creditors, the Debtor still had other necessary impaired classes in order to satisfy § 1129(a)(10) (requiring the affirmative vote of at least one impaired class).

Second, even placing Classes 3 and 4 together, as WNS urges, still yields an affirmative vote for the combined class. (*See* discussion, pp. 3-5 of this Memorandum Decision.)

Third, while WNS may quarrel with the Debtor's reason for placing the rejection creditors in a separate class, under *In re Johnston,* 21 F.3d 323 (9th Cir. 1994), the Debtor's reasons for doing so are not so strained as to translate into a finding of "bad faith." *See also In re Barakat*, 99 F.3d 1520, 1526 (9th Cir. 1996). In any event, the objection loses steam when Class 3 is combined with Class 4, as WNS suggests should be the case, because the combined class still accepts the plan.

This objection will be overruled.

## B. **WNS' MOTION TO CONVERT TO CHAPTER 7**

WNS has asked the court to convert the case to chapter 7. Because the court will confirm the plan, this motion will be denied, as moot.

## VI. **RULING**

1. The Debtor's second amended plan shall be confirmed;

2. All objections to the plan, unless otherwise resolved by agreement or stipulation, are overruled;

3. WNS' motion to convert to chapter 7 will be denied, as moot;

4. The Debtor and those parties which have made agreements that non-materially alter their plan treatment shall file such agreements with the court, or as necessary, seek approval thereof pursuant to FED. R. BANKR. P. 9019;

5. The Debtor shall lodge a proposed order confirming the second amended plan, attaching thereto a chart that briefly describes the final treatment accorded to each class;

6. The Debtor shall obtain and file an accepting ballot from each creditor which either voted to reject or did not vote, and which now supports and accepts the plan (including but not limited to Maricopa County, Pima County, UBS, WaMu, Countrywide, Wells Fargo, the eight employees, and WC Partners). This will complete the administrative voting record;

7. The Debtor and other interested parties should move as quickly as possible to obtain court-ordered settlements, and lodge the order confirming plan, so that the post-confirmation administration may begin; and

Case 4:07-bk-01578-EWH    Doc 1447    Filed 02/15/08    Entered 02/15/08 16:17:06    Desc
Main Document    Page 21 of 22

1     8.    All chapter 11 professionals shall prepare and file their final fee

2           applications as soon as possible, and provide notice to all parties.  The

3           court's courtroom deputy should provide a date for a unified hearing on

4           such applications.

5

6     DATED AND SIGNED ABOVE.



Case 4:07-bk-01578-EWH    Doc 1447    Filed 02/15/08    Entered 02/15/08 16:17:06    Desc
                    Main Document      Page 22 of 22