Todd A. Burgess (Bar No. 019013)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone: (602) 530-8000
Facsimile: (602) 530-8500
todd.burgess@gknet.com
Attorneys for Morris C. Aaron, Liquidating Trustee

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re:<br><br>FIRST MAGNUS FINANCIAL CORPORATION,<br><br>               Debtor. | Case No. 4:07-bk-01578-EWH<br><br>Chapter 11<br><br>**MOTION FOR ENTRY OF FINAL DECREE AND ORDER DISCHARGING TRUSTEES**<br><br>(Assigned to the Honorable Eileen W. Hollowell) |

Morris C. Aaron, Liquidating Trustee of the First Magnus Liquidating Trust (the "Liquidating Trustee" and the "Liquidating Trust," respectively), by and through undersigned counsel, respectfully requests that the Court enter a final decree closing the above-captioned chapter 11 case (the "Bankruptcy Case") filed by First Magnus Financial Corporation (the "Debtor"), pursuant to 11 U.S.C. § 350(a) and Rule 3022, Federal Rules of Bankruptcy Procedure, discharging and releasing the Liquidating Trustee and Litigation Trustee from any further duties, obligations, and liabilities in the Bankruptcy Case, and exonerating the bond posted by the Liquidating Trustee.

This motion is supported by the accompanying Memorandum of Points and Authorities, the Final Report and Accounting of the First Magnus Liquidating Trust, attached hereto as Exhibit "A," the Litigation Trustee's Final Report and Accounting,

4163566v1/22333-0003

filed by the Litigation Trustee concurrently herewith, and the entire record before the Court in the Bankruptcy Case. A proposed form of order is attached hereto as Exhibit "B" for the Court's consideration.

    RESPECTFULLY SUBMITTED this 17th day of June, 2015.

    GALLAGHER & KENNEDY, P.A.

By: */s/Todd A. Burgess (AZ019013)*
    Todd A. Burgess
    2575 East Camelback Road
    Phoenix, Arizona 85016-9225
    Attorneys for Morris C. Aaron,
    Liquidating Trustee

4163566v1/22333-0003

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. FACTUAL AND PROCEDURAL HISTORY.

### A. The Liquidation Plan.

1. On August 21, 2007 (the "Petition Date"), First Magnus Financial Corporation (the "Debtor") filed a voluntary petition under chapter 11 of title 11 of the United States Code initiating the above-captioned chapter 11 case (the "Bankruptcy Case").

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This motion presents a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3. On February 29, 2008, the Court entered the *Order Confirming Second Amended Plan of Liquidation Dated January 4, 2008 filed by First Magnus Financial Corporation* [Dkt. 1589] (the "Confirmation Order") confirming the *Second Amended Plan of Liquidation Dated January 4, 2008 filed by First Magnus Financial Corporation* [Dkt. 1065] (the "Plan").[1]

4. The Effective Date of the Plan occurred on May 1, 2008. [Dkt. 2438].

5. On the Effective Date, in accordance with the Plan and the Liquidating Trust Agreement dated April 30, 2008, the First Magnus Liquidating Trust (the "Liquidating Trust") was established and Morris C. Aaron was appointed Liquidating Trustee.

6. The Liquidating Trust was created and administered solely to implement the Plan and liquidate the Remaining Assets, including prosecuting, settling or abandoning the Estate Claims, and making disbursements from the Dividend Fund for payment of Allowed Claims in accordance with the terms of the Plan. The full rights, powers, and duties of the Liquidating Trustee are described in detail in the Liquidating Trust Agreement and the Plan.

---

[1] Unless otherwise stated, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan.

4165366V1/22533-0003

7. On the Effective Date, in accordance with the Plan and the Litigation Trust Agreement dated April 30, 2008, the First Magnus Litigation Trust (the "<u>Litigation Trust</u>") was established and Larry Lattig was appointed Litigation Trustee.

8. The purpose of the Litigation Trust was to (i) to investigate, prosecute, settle and/or abandon the Estate Tort and other Claims; (ii) to object to certain claims of creditors in connection with performing the actions in (i); (iii) to effectuate an orderly disposition of the Litigation Trust Estate, and to distribute and deposit into the Dividend Fund for distribution to the Beneficiaries the proceeds from the disposition of the Litigation Trust Estate all in accordance with the provisions of the Plan and the Litigation Trust Agreement.

9. On the Effective Date, in accordance with the Plan, a three (3) member creditor Advisory Board was created for the purpose of monitoring, and to a certain extent directing, the activities of the Liquidating Trust and the Litigation Trust. <u>Section 7.15.1</u> of the Plan provides in relevant part as follows:

> All discretionary actions to be taken by either the Liquidating Trustee or the Litigation Trustee with respect to the assets of the Liquidating Trust or the Litigation Trust, respectively, including distributions to creditors, the sale or abandonment of the Remaining Assets, the prosecution, compromise, settlement, or abandonment of any Estate Claim or Estate Tort and Other Claim, or the prosecution, compromise, settlement, or abandonment of any objection to Claim shall be done in consultation with the Advisory Board. In the event of any disagreement between either the Liquidating Trustee or the Litigation Trustee and the Advisory Board, the decision of the Advisory Board will control. Notwithstanding the foregoing sentence, if the disagreement between the either the Liquidating Trustee or the Litigation Trustee and the Advisory Board addresses (a) a sale transaction, or a series of sale transactions to the same Person, proposed to be undertaken by the Liquidating Trustee that involves consideration to or for the Liquidating Trust of a value of less than $500,000, (b) the Liquidating Trustee's proposed abandonment or settlement of any dispute regarding any Estate Claim or the release of any claim or Estate Claim or settlement of any litigation regarding any claim or Estate Claim which the Liquidating Trustee in good faith believes has a value of less than $250,000, (c) the Liquidating Trustee's proposal to not file or to settle any objection to a Claim that has a face amount that is less than $100,000, (d) the Litigation Trustee's proposed abandonment or settlement of any dispute regarding, or the release of, any Estate Tort and Other Claim or settlement of any litigation regarding any Estate Tort and Other Claim which the Litigation Trustee in good faith

believes has a value of less than $250,000 or (e) the Liquidating Trustee or the Litigation Trustee proposes to pay an expense in an amount less than $50,000, then the Liquidating Trustee's or the Litigation Trustee's decision shall control.

10. The Liquidating Trustee and Litigation Trustee regularly consulted with, and in appropriate instances followed the directives of, the Advisory Board from and after the Effective Date, as required by the Plan.

11. Pursuant to the Liquidating Trust Agreement and the Confirmation Order, the Liquidating Trust had a term of 5 years. Therefore, the Liquidating Trust expired on April 30, 2013. Since that time, the Liquidating Trustee has been in the process of winding up the affairs of the Liquidating Trust, and is preparing to make a final distribution to unsecured creditors. The Liquidating Trustee's Final Report and Accounting, attached hereto as Exhibit "A," provides a full accounting of the receipts and disbursements of the Liquidating Trust and summarizes the activities of the Liquidating Trust.

12. Pursuant to the Litigation Trust Agreement and the Confirmation Order, the Litigation Trust also had a term of 5 years. Therefore, the Litigation Trust also expired on April 30, 2013. Since that time, the Litigation Trustee has been in the process of winding up the affairs of the Litigation Trust, including transferring all net proceeds from the activities of the Litigation Trust to the Liquidating Trust for distribution to creditors in accordance with the Plan.

13. The Litigation Trustee's Final Report and Accounting, filed by the Litigation Trustee concurrently herewith, provides a full accounting of the receipts and disbursements of the Litigation Trust and summarizes the activities of the Litigation Trust.

**B.    Recoveries from Liquidation of Remaining Assets.**

1. As of the Effective Date of the Plan, the Liquidating Trust received a transfer from the Debtor of the "Scratch and Dent Assets". The Scratch and Dent Assets

4163566v1/22333-0003

3

Case 4:07-bk-01578-EWH    Doc 7456    Filed 06/17/15    Entered 06/17/15 10:54:08    Desc
Main Document    Page 5 of 16

included: (i) "scratch and dent loans," *i.e.*, loans that at origination contained defective documentation or other problems (e.g., a missing HUD statement, a document not notarized or some other documentary defect), (ii) "EPD" loans that were originated and sold by First Magnus, but were returned (or put back) to First Magnus based on an early payment default or breach or a warranty or representation specified in their Loan Purchase Agreements with investors or loan purchasers, (iii) "REO," real estate owned holdings acquired by First Magnus as a result of a judicial or non-judicial foreclosure of mortgage loans, and (iv) other miscellaneous cash notes (loans) held by First Magnus.

2. The Debtor's Disclosure Statement listed total Scratch and Dent Assets with a book value of $36,029,400, an estimated fair market value as of 12/31/2007 of $20,029,909, and an estimated liquidation value of $12,082,025.

3. The Liquidating Trust realized a total of $11,946,091 for the liquidation of the Scratch and Dent Assets.

4. As of the Effective Date of the Plan, the Liquidating Trust received a transfer of $9,622,524 being held in the DIP Hold Account. The DIP Hold Account was established by the Debtor to segregate, from the Debtor's general operating account, proceeds from the sale of mortgage loans and REO assets and other funds (such as mortgage impound accounts, loan pay-offs, and other similar items) in which the Debtors and one or more third-parties claimed an interest. The majority of the funds held in the DIP Hold Account were distributed in accordance with two settlement agreements.

5. Pursuant to an April 28, 2008 Settlement Agreement executed by Merrill Lynch Bank USA ("Merrill Lynch"), the Debtor, and the Official Committee of Unsecured Creditors, subsequently approved by the Court [Dkt. 3701], $100,000 of the disputed DIP Hold Account funds was paid to Merrill Lynch on June 26, 2008. The payment represented a portion of $879,065.16 (the "Nam Proceeds") of proceeds received by the Debtor pre-petition as a result of the pay-off of the "Nam Loan" on August 13,

2007 and deposited in the DIP Hold Account post-petition.

6. Pursuant to a December 1, 2009 settlement with Bank of America, N.A., Redwood Mortgage Funding, Inc., Countrywide Home Loans, Inc., Aurora Loan Services LLC, Wells Fargo Funding, Inc., Washington Mutual Mortgage Securities Corp., and JPMorgan Chase Bank, N.A., the Liquidating Trust paid $1,350,000 of the disputed funds held in the DIP Hold Account to the following third-party claimants:

    a.    Bank of America, N.A.    $45,900

    b.    Redwood Mortgage Funding, Inc.    $24,300

    c.    Countrywide Home Loans, Inc.    $179,550

    d.    Aurora Loan Services    $666,900

    e.    Wells Fargo Funding, Inc.    $85,050

    f.    Washington Mutual Mortgage Securities Corp.    $217,350

    g.    JPMorgan Chase Bank, N.A.    $130,950

7. Pursuant to a January 18, 2010 Settlement Agreement with JPMorgan Chase Bank, N.A., as the successor to the commercial banking business of Washington Mutual Bank, in its capacity as Administrative Agent (the "Agent") for the Buyers under the Mortgage Loan Repurchase Agreement dated as of June 29, 2007 (the "Repo Agreement"), and the following entities, each in its respective capacity as a Buyer under the Repo Agreement: JPMorgan Chase Bank, N.A., in its individual capacity, Sovereign Bank, PNC Bank (f/k/a National City Bank), BOA Lending L.L.P., Bank of the West, SummitBridge National Investments LLC, as successor to Harris Bank, N.A. and Residential Funding Company, LLC, BNP Paribas and Fortis Capital Corp., (collectively, the "Buyers"), the Liquidating Trust paid $2,000,000 of the disputed DIP Hold Account funds to the Agent for the benefit of the Buyers under the Repo Agreement.

8. Pursuant to a June 14, 2011 Settlement Agreement with JPMorgan Chase Bank, N.A., solely in its capacity as the purchaser of the assets of Washington Mutual

4163566v1/22333-0003

5

Bank, a Federal Association, and Washington Mutual Mortgages Security Corp., the Liquidating Trustee paid $557,000 of the disputed DIP Hold Account Funds to JPMorgan Chase Bank, N.A.

9. As a result of the foregoing settlements, the Liquidating Trust was able to retain $5,615,524 of the disputed DIP Hold Account funds for the benefit of creditors of the Debtor.

10. The Liquidating Trust filed over 190 adversary proceedings seeking the recovery of preferences under 11 U.S.C. § 547. Recoveries from preference actions pursued by the Liquidating Trust totaled $2,726,565.

11. The Liquidating Trust analyzed what appeared to be fraudulent loans to determine which loans may give rise causes of action against borrowers, title companies, brokers, appraisers, and other parties. The Liquidating Trust recovered a total of $1,761,412 from mortgage fraud litigation and other miscellaneous actions.

**C. Recoveries by the Litigation Trustee.**

1. The Litigation Trust was charged with pursuing "Estate Tort and Other Claims" as defined in the Plan, and resolving certain claims against the FMFC Estate.

2. After the Effective Date and pursuant to the Plan, the Liquidating Trustee provided initial funding to the Litigation Trust in the amount of $2,250,000. The Liquidating Trustee also maintained a reserve in the amount of $750,000 to the extent additional funding became necessary.

3. The Litigation Trustee's Final Report, filed concurrently herewith by the Litigation Trustee, contains a detailed description of each of the matters handled, gross recoveries, payments and other benefits conferred to creditors, and accounting of expenses.

4. Among other things, in addition to a return of the $2,250,000 initial funding provided by the Liquidating Trustee, the Litigation Trust distributed $2,175,000 to fund

distributions to priority and unsecured creditors under the Plan. The additional reserve of $750,000 maintained to fund additional expenses of the Litigation Trust was never utilized.

5. As detailed in the Litigation Trustee's Final Report and Accounting, the Litigation Trustee obtained, among other benefits, gross cash recoveries of $20,727,090.22, generated total cash payments of $8,387,773.33 for the benefit of creditors ($3,962,773.33 paid to WARN Claimants and the $4,425,000 distributed to the Liquidating Trust referenced in paragraph C4 above), and reduced claims in the Bankruptcy Case by $636,156,989.81.

**D.  Claims Litigation and Distributions.**

1. The following Administrative Expenses Claims were disallowed by the Bankruptcy Court.

| | |
|---|---:|
| WNS Claim for Lost Profits | $ 699,958 |
| WNS Claim for Substantial Contribution | $ 231,872 |
| Ed Hlavac Administrative Claim | $ 11,276 |
| Chanel Crouse Administrative Claim | $ 5,418 |
| Joe Kimball Administrative Claim | $ 12,753 |
| WARN Act Administrative Claims | $ 1,939,876 |
| Anna Tran Administrative Claim | $ 250,000 |
| Total Administrative Claims Denied | $ 3,151,153 |

2. The following administrative claims, with an original estimated claim amount of $321,863, were settled for $174,000.

    a.    The GE leasing administrative claim was settled for $9,000.

    b.    The JPMorgan Chase administrative claim was settled for $75,000.

    c.    The Dell computer administrative claim was settled for $90,000.

3. The Liquidating Trust paid a total of $2,510,126 to holders of Allowed Administrative Expense Claims under the Plan.

4. Alleged Secured Claims filed against the Debtors totaled $9,276,535. All Allowed Secured Claims were paid or otherwise satisfied by the Liquidating Trust in accordance with the terms of the Plan, including in most cases, by the abandonment of the collateral securing such claims. The Liquidating Trustee distributed a total of $113,840 to holders of Allowed Secured Claims in full satisfaction of such claims.

5. Alleged Priority Tax Claims filed against the Debtors totaled $1,845,348. All Allowed Priority Tax Claims were paid or satisfied by the Liquidating Trust. The Liquidating Trustee distributed a total of $335,274.16 to holders of Allowed Priority Tax Claims in full satisfaction of such claims.

6. Prior to its Chapter 11 filing, First Magnus had over 5,000 employees. The Liquidating Trust reviewed all priority and non-priority claims alleged by former employees. The Liquidating Trust objected to or initiated motions to reclassify in excess of 3,100 former employee proofs of claim.

7. The Liquidating Trust reviewed employee claims with an initial value of $45.3 million and settled those claims for $20.1 million, a reduction of $25.2 million. The Liquidating Trust reconciled the claims to the books and records of First Magnus and found $2.4 million in claims due to employees that were included in the original statements and schedules for which the claimant never filed a proof of claim. These employees were entitled to payment for their allowed claims to the same extent as employees that filed proofs of claim. The below table summarizes the total claims received, the ultimate disposition of those claims, and the total allowed priority and non-priority claims owed to employees.

|  | Priority | Non Priority | Secured | Unknown | Total |
|---|---|---|---|---|---|
| Initial claims filed | $ 21,232,862 | $ 21,855,762 | $ 657,855 | $ 1,536,336 | $ 45,282,816 |
| Claims objected | $ 9,448,815 | $ 13,517,758 | $ 657,855 | $ 1,536,336 | $ 25,160,763 |
| Claims accepted | $ 11,784,048 | $ 8,338,005 | $ - | $ - | $ 20,122,053 |

4163566v1/22333-0003

| | | | | | |
|---|---:|---:|---:|---:|---:|
| Amounts due no proof of claim filed | $ 2,371,833 | $ 19,803.97 | $ - | $ - | $ 2,391,637 |
| **Total** | **$ 14,155,881** | **$ 8,357,809** | **$ -** | **$ -** | **$ 22,513,689** |

8.  The Liquidating Trust paid a total of $17,056,612 in satisfaction of Allowed Priority Non-Tax Claims filed by former employees of First Magnus inclusive of related payroll taxes and accrued interest.[2]

9.  Alleged Priority Non-Tax and Non-Employee Claims filed against the Debtors totaled $805,079. All Allowed Non-Tax and Non-Employee Priority Claims were objected to by the Liquidating Trust. The Liquidating Trustee had no distributions to holders of Allowed Non-Tax and Non-Employee Priority Claims in full satisfaction of such claims.

10. In addition to the employee claims discussed above, a number of former employee's that were part of a WARN Act class action litigation filed against First Magnus also filed administrative and priority claims against the estate totaling approximately $8.5 million. The Liquidating Trust objected to the claims. In January 2010, the Bankruptcy Court entered an order approving a settlement negotiated by the Litigation Trustee in the First Magnus Capital Inc. ("FMCI") Chapter 11 case. As part of that settlement, the WARN Act claimants agreed to release all alleged claims in the First Magnus case.

11. The Liquidating Trustee distributed a total of $25,571 to holders of Allowed Credit Borrower Claims in full satisfaction of such claims.

---

[2] The Liquidating Trust was required to pay the "employer" share of all federal, state, and local payroll taxes attributable to the Allowed Employee Wage Claims in addition to paying the Allowed amount of each Claim. In addition, pursuant to Section 4.3 of the Plan, holders of Allowed Priority Non-Tax Claims were entitled to receive interest at the rate of 5% per annum from the Effective Date until paid in full. The Liquidating Trust was required to pay a total of $1,913,700 in interest to holders of Allowed Priority Non-Tax Claims.

4163566v1/22333-0003

12. The Liquidating Trustee reviewed all general unsecured claims filed against the Debtor, excluding claims filed by past and present directors, officers, Insiders and Affiliates of First Magnus, Warehouse Lenders, and Repo Participants, which claims were reviewed by the Litigation Trust. General unsecured claims reviewed by the Liquidating Trust totaled $298,626,022, which included a $218,717,710 claim filed by Washington Mutual Bank, in its capacity as Administrative Agent for the Buyers under the Mortgage Loan Repurchase Agreement dated as of June 29, 2007. The Liquidating Trustee filed objections to over 600 claims, resulting in Allowed Unsecured Claims totaling $103,141,885 and the disallowance of $195,484,137 of alleged General Unsecured Claims.

13. As described in more detail in the Litigation Trustee's final report, the Litigation Trust reviewed general unsecured claims totaling $720,539,128. The Litigation Trust filed objections to 55 claims, resulting in Allowed Unsecured Claims totaling $84,371,179 and the disallowance of $636,157,000 of general unsecured claims.

14. Allowed General Unsecured Claims against the First Magnus estate total $199,314,668. Pursuant to Section 11.7 of the Plan, the minimum payment to holders of Allowed Claims under the Plan is $20. Therefore, only creditors holding an Allowed General Unsecured Claims of $21,276.35 or more will receive a distribution from the Liquidating Trust. A total of $232,856[3] is available for distribution to holders of Allowed Unsecured Claims. Attached as Exhibit 2 to the Liquidating Trustee's Final Report is a summary of all Allowed General Unsecured Claims entitled to a distribution, including the Allowed amount of the Claim and the amount of the proposed distribution.

15. Attached as Exhibit 3 to the Liquidating Trustee's Final Report is the Liquidating Trustee's final accounting of the Liquidating Trust, including all sources and

---

[3] The total amount available for distribution to unsecured creditors is estimated and assumes that the Liquidating Trustee will not incur substantial additional fees and expenses related to obtaining a final decree in the case.

4163566v1/22533-0003

uses of funds on a weekly basis.

16. The Liquidating Trust and Litigation Trust have filed all post-confirmation reports, and the Liquidating Trust is current on all payments due to the US Trustee.

17. With the exception of making the final distributions to creditors holding General Unsecured Claims, in accordance with the distribution schedule attached as Exhibit 2 to the Liquidating Trust's Final Report, the case has been fully administered and is ready to be closed.

**II.    REQUEST FOR ENTRY OF FINAL DECREE.**

1. The Liquidating Trustee respectfully requests that the Court enter a final decree closing the case, pursuant to Section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022.

2. Bankruptcy Code § 350(a) requires the Court to close a case after the estate has been fully administered. The Advisory Committee's Notes to Bankruptcy Rule 3022 list the following factors to be considered in determining whether a case has been fully administered:

- whether the order confirming the plan has become final;
- whether deposits required by the plan have been distributed;
- whether the property proposed to be transferred under the plan has been transferred;
- whether the debtor or debtor in possession or its successor under the plan has assumed the business of management of the property dealt with under the plan;
- whether payments under the plan have commenced;
- whether all motions, contested matters, and adversary proceedings have been fully resolved.

3.     As recognized by various courts in the Ninth Circuit, there is no requirement that an administrative case remain open while a debtor is completing performance under a confirmed plan:

> A bankruptcy case need not remain open while the debtor is performing a plan. Section 350(a) and Rule 3022 permit the closure of the case when it is "fully administered." Fed.R.Bankr.P. 3022; 11 U.S.C. § 350(a). A case may be fully administered even though all payments to creditors have not been completed. *In re Ground Systems, Inc.,* 213 B.R. 1016, 1019 (9th Cir. BAP 1997). Rather, if payments under the plan have commenced and there are no contested matters or adversary proceedings pending or likely to be filed, the case may be closed. If it is necessary to invoke the bankruptcy court's jurisdiction after the case is closed, the case may be re-opened. 11 U.S.C. § 350(b).

*In re D & L Nicolaysen*, 228 B.R. 252, 261 (Bankr. E.D. Cal. 1998) (footnotes omitted).

4.     "The final decree does not adjudicate any rights between the parties and is more of an administrative step to allow the clerk's office to dispose of the fully administered case file. The final decree is rarely entered at the exact point in time when a case becomes fully administered." *In re Indian Creek Ltd. P'ship,* 205 B.R. 609, 611 (Bankr. D. Ariz. 1997) (quoting *In re Beechknoll Nursing Homes, Inc.,* 202 B.R. 260, 261 (Bankr.S.D.Ohio 1996)).

5.     Other bankruptcy courts have held that closing of a bankruptcy case is an administrative step, and does not deprive the Court of jurisdiction over matters relevant to the case. *See In re Taylor,* 216 B.R. 515, 521-22 (Bankr. E.D. Pa. 1998) ("However, the fact that a case is or is not closed merely relates to its administrative status, which does not affect a bankruptcy court's jurisdiction to determine matters relevant to the case). *See In re Statistical Tabulating Corp.,* 60 F.3d 1286, 1289–90 (7th Cir.1995), *cert. denied sub nom. LaSalle Bank Lake View v. United States,* 516 U.S. 1093, 116 S.Ct. 815, 133 L.Ed.2d 759 (1996); and *In re Germaine,* 152 B.R. 619, 624 (9th Cir. BAP 1993). A matter over which a bankruptcy court has jurisdiction can be considered by that court even if the case is closed. *See Koehler v. Grant,* 213 B.R. 567, 569–70 (8th Cir. BAP 1997)").

4163566v1/22333-0003

12

Case 4:07-bk-01578-EWH    Doc 7456    Filed 06/17/15    Entered 06/17/15 10:54:08    Desc
Main Document    Page 14 of 16

6. As detailed above, with the exception of making the final distributions to creditors holding General Unsecured Claims, in accordance with the distribution schedule attached as Exhibit 2 to the Liquidating Trust's Final Report, the case has been fully administered and is ready to be closed.

7. There are no pending motions, contested matters, or adversary proceedings.

8. A final post-confirmation quarterly report for Q2 2015 will be timely filed, and all post-confirmation quarterly fees will be timely paid.

9. Accordingly, because the case has been fully administered, entry of a final decree and order closing the case is appropriate at this time. *See In re Rhead,* 232 B.R. 175, 179 (Bankr. D. Ariz. 1999) ("The statute requires fees to be paid 'in each case' and not 'in each unconsummated case.' The more logical interpretation is that fees are no longer owed once the case is converted, dismissed, or *closed.* Closure sets an identifiable time at which fees will terminate automatically, whereas substantial consummation would create 'a level of uncertainty that is unworkable'…. the text of the amended statute supports the reasonable interpretation that closure of the case is an implied alternative disposition to conversion or dismissal upon which trustee's fees will no longer accrue.") (Internal citations omitted).

10. Based on the reasoning and authorities set forth above, it is appropriate for this Court to determine that the Plan has been substantially consummated and that the above-captioned case should be closed.

### III. CONCLUSION.

WHEREFORE, based on all of the foregoing, the Liquidating Trustee respectfully asks that the Court enter an order in the form attached hereto as Exhibit "B":

A. Entering the final decree closing the above-captioned chapter 11 case.

B. Discharging and releasing the Litigation Trustee from all duties, obligations, and liabilities arising under the Plan and in relation to the Bankruptcy Case; and, subject

4163566v1/22333-0003

only to the Liquidating Trustee making the final distribution to unsecured creditors, discharging and releasing the Liquidating Trustee from all duties, obligations, and liabilities arising under the Plan and in relation to the Bankruptcy Case;

       C.      Exonerating the bond posted by the Liquidating Trustee; and

       D.      Granting such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 17th day of June, 2015.

                                                       GALLAGHER & KENNEDY, P.A.

                                                       By: */s/Todd A. Burgess (AZ019013)*
                                                           Todd A. Burgess
                                                           2575 East Camelback Road
                                                           Phoenix, Arizona 85016-9225
                                                           Attorneys for Morris C. Aaron,
                                                           Liquidating Trustee

4163566v1/22333-0003

14